Argued and submitted January 28, 1986, Court of Appeals affirmed and trial court reversed January 13, 1987

## SACHER,
*Petitioner on Review,*

*v.*

## BOHEMIA, INC.,
*Respondent on Review.*

(TC No. 16-80-01732; CA A31373; SC S32129)

731 P2d 434

William H. Wiswall, Springfield, argued the cause for petitioner on review. With him on the petition were Karen Hendricks, and Wiswall and Hendricks, P.C., Springfield, and Jacob Tanzer, and Ball, Janik & Novack, Portland.

Richard A. Roseta of Flinn, Brown & Roseta, Eugene, argued the cause for respondent on review.

CARSON, J.

## CARSON, J.

This is a negligence action brought by plaintiff under Oregon's Employer Liability Act (ELA), ORS 654.305 to 654.335. Plaintiff was injured by a mill table saw owned by his employer, Cascade Handle Company, Inc. (Cascade), located on the premises of the Culp Creek sawmill owned by Bohemia, Inc. (Bohemia). Plaintiff sought to recover damages for severe injury to his hand from Bohemia under ORS 654.305 and 654.310. The jury returned a verdict in plaintiff's favor. After reduction for plaintiff's comparative negligence, the trial court entered a judgment for $420,000. Bohemia appealed, arguing that the trial court erred by denying its motion for directed verdict. The Court of Appeals reversed. *Sacher v. Bohemia, Inc.,* 74 Or App 685, 704 P2d 528 (1985). We affirm the Court of Appeals.

## THE STATUTES

ORS 654.305 provides:

"Generally, all owners, contractors or subcontractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employes or the public, shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices."

ORS 654.310 provides:

"All owners, contractors, subcontractors, or persons whatsoever, engaged in the construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure, or in the erection or operation of any machinery, or in the manufacture, transmission and use of electricity, or in the manufacture or use of any dangerous appliance or substance, shall see that all places of employment are in compliance with every applicable order, decision, direction, standard, rule or regulation made or prescribed by the Workers' Compensation Department pursuant to ORS 654.001 to 654.295."

## FACTS

Plaintiff's employer, Cascade, manufactures broom handles at its home plant in Eugene. In order to obtain the

wooden stock or blanks from which to make the handles, Cascade contracted with lumber producers, such as Bohemia, whose waste from sawmill operations produced suitable raw materials. In 1973, Cascade built and installed a permanent facility at Bohemia's Culp Creek sawmill to scavenge suitable pieces of waste wood and prepare them for handle manufacture.

Cascade's operation at the Culp Creek sawmill consisted of a combination saw[1] mounted upon a 30 by 15 foot platform located adjacent to Bohemia's waste wood conveyor and approximately 50 feet from Bohemia's trim saw. Cascade's saw unit, containing both horizontal and vertical saw blades, was approximately six or seven feet long and partially enclosed in a plywood shell. The wood scavenged from the Bohemia waste wood conveyor was fed into one end of the saw unit by one Cascade employee. The wood then would be run through feed rollers to position it for a cut by the vertical saw blades. The material then passed through another set of feed rollers that positioned the wood for the horizontal saw blade. The ends then were trimmed by the trim saws. The handle blanks and waste from the blank operation then were expelled from the saw unit where the other Cascade employee, the offbearer or outfeed operator, removed the blanks and stacked them to be bundled. When the area provided for stacking became full, the Cascade employees would bundle the blanks into units and deposit the unit bundles into large bins on the level below the platform. When a bin was full, a Bohemia forklift operator would remove it to an area of the mill yard to await loading upon a Cascade truck. Bohemia's forklift operator also would load the bundled blanks onto Cascade's truck to be transported to Cascade's home plant. The waste from the Cascade saw unit was replaced onto the Bohemia conveyor to continue its journey to the chipper or the "hog." The sawdust generated was added to the waste on Bohemia's "hog" conveyor. The record indicates that Bohemia was paid by the piece or board foot of the finished blanks, and received

---

[1] The saw unit was constructed by Cascade, using a vertical saw from Cascade's Springfield warehouse. The saw unit originally had two circular vertical saw blades mounted parallel to each other. The Cascade millwright and machinist added a third horizontal saw blade to the unit so as to make the most efficient use of space. The saw unit produced squared blanks.

approximately $2,000 a month from Cascade for the waste wood scavenged for the handle operation.

The platform and shelter housing the Cascade saw unit were designed and constructed by Cascade employees with materials purchased from Bohemia. Bohemia's saw filer occasionally sharpened the blades of the Cascade saws. Bohemia's millwright repaired Cascade's storage table and taught plaintiff to do the same. The millwright also instructed plaintiff how to repair the conveyor systems and plaintiff undertook the repair responsibility for both the Cascade and Bohemia operations.

Bohemia employees worked in close proximity and, upon occasion, side-by-side with Cascade employees, including plaintiff. The employees of both companies took breaks and meals at the same time and shared common facilities for such respite.

Plaintiff was injured when he attempted to remove a "sticker" — a piece of wood jammed in the feed rollers between the two vertical saw blades and the single horizontal saw blade — while the saws were running. The vertical blades, which rotated away from plaintiff, caught the piece of wood being used by plaintiff to dislodge the "sticker" and drew his hand into the blades, causing severe injury.

## THE OREGON EMPLOYERS' LIABILITY ACT

Oregon's Employers' Liability Act originally was proposed by initiative in 1910 and adopted as Oregon Laws 1911, chapter 3. Its purpose was to impose higher standards of care than did the common law upon employers engaged in lines of work "involving risk or danger." Or Laws 1911, ch 3, § 1. The ELA gives rise to actions in negligence, but it does not create a cause of action in addition to that of the common law. *See Howard v. Foster & Kleiser,* 217 Or 516, 533, 332 P2d 621, 629 (1958); *Shelton v. Paris,* 199 Or 365, 368, 261 P2d 856, 860 (1953).

Until 1913, when Oregon's first Worker's Compensation Act was enacted (Or Laws 1913, ch 112), employees injured on the job could proceed against their employers under common-law negligence, negligence *per se* or, after 1911, the ELA, for injuries resulting from inherently dangerous or risky work. The ELA applied only to employers "having charge of,

or responsible for, any work involving risk or danger to the employees or the public." *See* Or Laws 1911, ch 3, § 1.[2]

From 1913 to 1965, employers that would otherwise be subject to the ELA for injuries to their employees (*i.e.,* those in charge of, or responsible for work involving risk or danger to their employees) could opt into the Worker's Compensation Act which would immunize them from liability under the ELA, or opt not to participate in the Worker's Compensation Act and to remain subject to the ELA. *See former* ORS 656.022(1); 656.024 *repealed by* Or Laws 1965, ch 285, § 95.[3]

Initially, the ELA was held to allow both members of the general public and employees of employers engaged in "work involving risk or danger" to recover for injuries sustained from inherently dangerous instrumentalities under the control of the employer. *See Clayton v. Enterprise Electric Co.,* 82 Or 149, 161 P 411 (1916). Two years after *Clayton,* in *Turnidge v. Thompson,* 89 Or 637, 175 P 281 (1918), the court limited *Clayton* and held that members of the general public, as such, could not recover under the ELA. In construing provisions of the original Act regarding "work on or about [electrical] wire," the court stated: "Turnidge was neither a person engaged in work on or about the wire [that caused his death] nor [was he] an employee of the owner of the wire." 89 Or at 653.

This court held in *Byers v. Hardy,* 216 Or 42, 48, 337 P2d 806 (1959), that an action against a third-party employer could only be maintained because of the reference in ORS 654.305 to a risk or danger to "the public." "This court has consistently held that it is not every member of the public that is thus protected." 216 Or at 48. The court held that those members of the "public" who are protected are:

"* * * only those whose employment or duties require them to be about machinery of an employer other than his own or

---

[2] ORS 654.305 is taken verbatim from that part of Oregon Laws 1911, chapter 3, section 1, referred to as the "and generally" clause.

[3] In 1965, the legislature decided that virtually all employers should be subject to the Workers' Compensation Laws. ORS 656.022. ORS 656.020 allows injured workers to bring an action for damages against their employer, if that employer has failed to comply with the requirements of the Workers' Compensation Law. If the work involves risk or danger, the ELA may apply.

whose duties may require such person to expose himself in or about hazardous conditions or structures of such other employer which are prohibited or circumscribed by the Act. * * *" 216 Or at 48.

Because Bohemia was not plaintiff's employer, we examine the basis upon which Bohemia otherwise could be held responsible for plaintiff's injury. As we held in *Miller v. Georgia-Pacific Corp.*, 294 Or 750, 754, 662 P2d 718 (1983):

"Before the ELA can be made the basis of a claim for relief by an injured worker suing a defendant other than an employer of the worker, however, the defendant must be in charge of or have responsibility for work involving risk or danger in either (a) a situation where defendant and plaintiff's employer are simultaneously engaged in carrying out work on a common enterprise, or (b) a situation in which the defendant retains a right to control or actually exercises control as to the manner or method in which the risk-producing activity is performed. *Wilson v. P.G.E. Company,* 252 Or 385, 391-92, 448 P2d 562 (1969); *Thomas v. Foglio,* 225 Or 540, 545-57, 358 P2d 1066 (1961). * * *"

The present dispute involves the application of the first branch of statutory liability, "common enterprise."

### COMMON ENTERPRISE

The "common enterprise" rationale had its genesis in the "intermingled employees" rule first announced in *Rorvik v. North Pac. Lumber Co.,* 99 Or 58, 190 P 331 (1920), 99 Or 82, 195 P 163 (1921). In *Rorvik,* the plaintiff's decedent was killed while supervising the loading of the steamship of which he was captain. At the time of the incident that caused his death, the decedent was standing on the dock adjacent to a pile of lumber stacked by the defendant's employee to be loaded upon the decedent's vessel. He was fatally injured when two carloads of lumber, being propelled by a horse, struck and toppled a pile of lumber which was stacked too close to the tracks upon which the cars ran. This court stated:

"* * * [W]e deduce the rule that the Employers' Liability Act does not extend to the protection of the general public as such, but that it does extend its protection to employees of the particular person owning or operating dangerous machinery or engaged in hazardous employments, and to other persons or employees of other corporations whose lawful duties require

them to be or work about such machinery, or expose themselves to the hazards of the machinery or appliances in use by the owner thereof." 99 Or at 70.[4]

In *Meyers v. Staub,* 201 Or 663, 272 P2d 203 (1954), this court held it sufficient to invoke the ELA if the defendant third-party employer's "interlocking interests with the employer amount to 'an intermingling of duties and responsibilities' so as to bring relationship of the defendant to the workman within the spirit of the [ELA]." 201 Or at 668, citing *Drefs v. Holman Transfer Co.,* 130 Or 452, 456, 280 P 505 (1929) and *Clayton v. Enterprise Electric Co., supra.*

In *Warner v. Synnes,* 114 Or 451, 230 P 362 (1924), 114 Or 459, 235 P 459 (1925), this court stated that where a contractor supplies employees to do work for another, and that other employer retains control over a risk-creating or dangerous activity, an employee injured by that activity would have an action under the ELA against the third-party employer. The court found that the third-party employer in *Warner* had no control over the risk-creating activity or the individual employee; thus the employee had no action under the ELA.

In *Thomas v. Foglio,* 225 Or 540, 545, 358 P2d 1066 (1961), the court noted that the defendant must be the plaintiff's employer in some sense of the word to be liable under ELA.

"At the juncture where we held that a plaintiff could recover under the Employers' Liability Law against one who did not directly employ him, the word 'employer' took on a special and broader meaning embracing situations in which

---

[4] In *Rorvik v. North Pac. Lumber Co.,* 99 Or 58, 78, 190 P 331 (1920), 99 Or 82, 195 P 163 (1921), the court noted that:

"* * * the deceased was necessarily in the position he occupied and engaged with defendants' employees in loading the vessel. It is true that the duties of the deceased and the employees of the steamship company began where the actual physical labor of defendants' employees left off, but no link in the chain was broken; the loading was a continuous work, and could not be otherwise; the lumber was put upon the slings extending from the vessel by defendants' employees, and from that position moved aboard by machinery operated by the employees of the steamship company. The vessel could not be loaded in any other manner, and while deceased was in one sense a 'member of the public,' in another he was an employee engaged in working about or in the vicinity of machinery, found by the jury to be dangerous, which brings the case squarely within the rule announced in *Clayton v. Enterprise Electric Co.,* 82 Or 149 (161 Pac 411)."

the defendant would not be considered an employer of the plaintiff workman as that term is ordinarily understood. The treatment of the defendant as the employer of one whom he has not *directly* [emphasis in original] employed to do the work out of which the injury arises can be justified on the ground that *the plaintiff becomes the defendant's employee in the sense that the plaintiff is performing work on a project of which defendant's operations are an integral part. The plaintiff becomes, in effect, an adopted employee to carry out the work project in which plaintiff's actual employer and his adoptive employer are participating. To draw the defendant into the employer-employee relationship in this sense, it must be shown that the defendant was one 'having charge of, or responsible for the work.'* ORS 654.305." (Emphasis added.)

It was to bring employers other than the injured worker's direct employer within the Act's provision that the "common enterprise" rationale was developed.

In *Wilson v. P.G.E. Company,* 252 Or 385, 448 P2d 562 (1969), a case decided under the "contractor-right of control" branch of the ELA, the court concluded that for a case to fall under the "common enterprise" theory, the defendant employer must do more than have its own employees working with plaintiff toward the furtherance of a common enterprise. The defendant's control must create the risk of danger which resulted in the plaintiff's injury.

"We do not construe the ELA to impose a duty upon each employer, engaged in a common enterprise with another, to make safe the equipment and method of work of the other, even though both have a measure of control over the activity in which they are jointly engaged. The injury must result by virtue of the commingling of the activities of the two employers and not be solely attributable to the activities or failures of the injured workman's employer." 252 Or at 391. (Citation omitted.)

This same rationale was recently applied in the decision of the Court of Appeals in *Miller v. Georgia-Pacific Corp.,* 55 Or App 358, 362-63, 637 P2d 1354 (1981), with which this court agreed. *See Miller v. Georgia-Pacific Corp., supra,* 294 Or at 756.

The "common enterprise" test set forth in *Wilson* was drawn from *Thomas,* where this court held that the ELA could be invoked against a third-party employer when the

third-party employer defendant and the plaintiff's employer participated in a common enterprise involving an "intermingling of duties and responsibility" of the employees of both employers. 225 Or at 547. This participation must be more than a common interest in an economic benefit which might accrue from the accomplishment of the enterprise. *See Wilson v. P.G.E. Company, supra; Warner v. Synnes, supra.* However, "[a]n employer may be in 'charge of' work within the meaning of ORS 654.305 even though he is in charge of an activity which forms only a component part of a common enterprise." *Thomas v. Foglio, supra,* 225 Or at 549. In *Thomas,* this court held that an employer can be regarded as "having charge of" work where the component part of the general undertaking for which he is responsible involves any risk-creating activity on the part of his employees or calls for the use of equipment over which he has control and which, if not maintained with proper safeguards, necessarily exposes the employees of the other employer to an unreasonable risk in the course of carrying on the common enterprise. 225 Or at 549-50. "[T]he word 'work' in ORS 654.305 means more than actual physical movement of employees hired to perform a job; it means the entire enterprise with all of the component parts necessary to the completion of the enterprise in which both employers have joined to accomplish." 225 Or at 549-50.

■ ■　Under the "common enterprise" test, control or charge over the particular employee injured is not required to invoke the ELA, but control or charge[5] over the activity or instrumentality that causes the injury is. *See Thomas v. Foglio, supra; Metcalf v. Roessel,* 255 Or 186, 190-91, 465 P2d 699 (1970). Thus, third-party employers may be held liable if their negligence, as measured by the ELA, results in injury to: 1) an "adopted" employee (*see Thomas v. Foglio, supra*); or 2) an "intermingled" employee (*see Rorvik v. North Pac. Lumber Co., supra*); or 3) an employee of an independent contractor hired by the defendant employer where the defendant employer retains or exercises a right to control the risk-creating activity or instrumentality (*see Warner v. Synnes, supra*).

■　Thus, the "common enterprise" test requires, first, that two employers (the plaintiff's actual employer and a

---

[5] This control or "charge" may be exercised directly or through intermediaries. *See* ORS 654.320.

third-party defendant employer) participate in a project of which the defendant employer's operations are an "integral" or "component" part,[6] *Thomas*; second, the work must involve a risk or danger to the "employes or the public," ORS 654.305; third, the plaintiff must be an "employee" of the defendant employer, as enumerated above; and fourth, the defendant employer must have charge of or responsibility for the activity or instrumentality that causes the plaintiff's injury, *Thomas*.

## APPLICATION TO THIS CASE

In this case, Bohemia employees assisted in the handle-blank operation by forklifting completed bins of blanks to the yard, later loading those blanks onto Cascade trucks for transport to Cascade's home plant, by occasionally sharpening Cascade's saws and by producing the wood waste that the Cascade employees scavenged for blank production. Bohemia also supplied the conveyors used to bring Bohemia waste wood to the Cascade operation and to transport Bohemia and Cascade waste to the chipper or "hog." Cascade employees, including plaintiff, undertook at least some responsibility for the maintenance and repair of Bohemia's waste conveyor system, including removing pieces of metal detected by a metal detector, thawing frozen rollers and replacing worn out pins and rollers. Bohemia had the right, by contract, to approve all hiring of employees to work in Cascade's handle blank operation. These facts do not meet the requirements to make this joint project a "common enterprise."

The dispositive factor in this case is that there is no evidence that Bohemia was in charge of or responsible for that part of the handle blank production operation that caused plaintiff's injury. Cascade alone designed, built, installed and operated the saw unit. They provided their own labor, maintenance, supplies and paid for their own utilities. Plaintiff was not injured because of a failure on Bohemia's part to take proper precautions regarding its own equipment (the conveyors, forklift or other nearby mill machinery)[7] or employees.

---

[6] In *Thomas v. Foglio*, 225 Or 540, 358 P2d 1066 (1961), the words "integral" (at p 545) and "component" (at p 549) part were used, perhaps, as synonyms.

[7] As the Court of Appeals pointed out, "[t]he case could be different, for example, if plaintiff had been injured while operating or repairing the conveyer, which appears to have been under Bohemias's direct control." *Sacher v. Bohemia, Inc.*, 74 Or App 685, 691, 704 P2d 528 (1985). We need not decide that question today.

Bohemia was not shown to be in charge of or responsible for the design, maintenance or operation of the Cascade saw unit nor the activity of plaintiff while operating the saw unit. Plaintiff did not establish that a "common enterprise" existed between Bohemia and Cascade, therefore, Bohemia may not be held liable under the ELA for plaintiff's injuries.

The Court of Appeals is affirmed. The trial court is reversed.