Argued and submitted July 11, 2013, affirmed December 31, 2014, petition for review allowed April 24, 2015 (357 Or 164)

Arthur YEATTS;
and Nancy Doty, Inc.,
Special Fiduciary for Arthur Yeatts,
*Plaintiffs-Appellants,*

*and*

Matthew WHITMAN,
*Plaintiff,*

*v.*

POLYGON NORTHWEST COMPANY,
a foreign corporation,
*Defendant-Respondent.*

Clackamas County Circuit Court
CV08020124; A150199

341 P3d 864

Jeffrey S. Jones, Judge.

Robert K. Udziela argued the cause for appellants. With him on the opening brief were J. Randolph Pickett, R. Brendan Dummigan, Kimberly O. Pickett, and Pickett Dummigan LLP, and Scott M. Supperstein and Law Office of Scott Supperstein, P.C., and Jeffrey A. Bowersox and Bowersox Law Firm P.C. With him on the reply brief were

Jeffrey A. Bowersox and Bowersox Law Firm P.C., and J. Randolph Pickett, R. Brendan Dummigan, and Pickett Dummigan LLP, and Scott M. Supperstein and Law Office of Scott Supperstein, P.C.

Bruce H. Cahn argued the cause for respondent. With him on the brief were Aaron D. Goldstein and Ball Janik LLP.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

In this personal injury case, plaintiff[1] appeals a general judgment in favor of defendant, Polygon Northwest Company (Polygon), assigning error to the trial court's grant of summary judgment in favor of Polygon on plaintiff's claims for relief under Oregon's Employer Liability Law (ELL), ORS 654.305 to 654.336, and for common-law negligence. The trial court entered judgment for Polygon based on its conclusion that there were no genuine issues as to any material facts and that Polygon was entitled to prevail as a matter of law. On appeal, plaintiff contends that he presented sufficient evidence to create genuine issues of material fact on both of his claims and, as a result, that summary judgment was not appropriate. We affirm.

## I.   FACTS AND PROCEDURAL HISTORY

When reviewing a trial court's grant of summary judgment, we view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the nonmoving party, in this case, plaintiff. *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). When viewed in the light most favorable to plaintiff, the record establishes the following facts.

Polygon was the general contractor for a residential townhouse development project. In 2005, Polygon, on behalf of the developer, signed a contract with plaintiff's employer, Wood Mechanix, LLC (Wood Mechanix) to perform framing work on the project. The contract provided that Wood Mechanix "shall, at all times, be responsible for providing a safe work site and be responsible for the safety" of its employees and equipment. As part of the contract, Wood Mechanix was required to develop a site-specific safety plan that identified the anticipated hazards of the framing work and the specific means that it would use to address those hazards.

---

[1] Plaintiff Arthur Yeatts initiated the action, but, due to his health, a special fiduciary with power to manage this litigation was appointed for him. Plaintiffs-appellants are Arthur Yeatts and Nancy Doty, Inc., Special Fiduciary for Arthur Yeatts. For ease of reference, we use "plaintiff" throughout the opinion in reference to Yeatts.

Wood Mechanix was required to submit its safety plan to Polygon before beginning work on the project.[2]

The contract required Wood Mechanix's owner, Stan Trytko, to attend a meeting with Polygon's superintendent before beginning work on the project. At that meeting, Trytko completed a checklist entitled "Subcontractor Precon Safety Orientation" that required him to answer "yes," "no," or "N/A" to a number of questions related to Wood Mechanix's safety plan for the project. On the form, Trytko confirmed that Wood Mechanix had provided its "Fall Protection Program" to Polygon and had "Fall Protection Work Plan" forms available for each building on which it would work. Trytko also confirmed that the plan:

"• Identif[ied] all fall hazards[.]

"• Describe[d] the method of fall arrest or fall restraint to be used for these hazards[.]

"• Describe[d] the correct procedures for assembly, maintenance, inspection and disassembly of the fall protection system[.]"

Trytko verified that Wood Mechanix's employees were trained and instructed in the above items and that Wood Mechanix would have a "competent and qualified person" inspect the fall-protection equipment daily. Wood Mechanix decided to use guardrails as its form of fall protection on the project.

Polygon prepared a site-specific, internal safety manual on behalf of the developer for use by Polygon's employees. Within the Polygon safety manual, there is a "Fall Protection Plan." On one page of that plan, there is a list of various work-site conditions or tasks, such as "Painting"

---

[2] The contract provided that the developer, Tanasbourne Place Townhomes, LLC, was the "Contractor," the party contracting with Wood Mechanix. However, plaintiff asserts that "there is a more than adequate factual basis on which reasonable jurors could conclude" that Polygon and the developer "functioned as the same entity in connection with the project." Polygon makes no attempt to refute plaintiff's assertion and instead assumes for purposes of its arguments on appeal that the Contractor's rights upon which plaintiff relies, *e.g.*, the right to receive Wood Mechanix's safety plan and the right to request other safety measures, were those of Polygon.

or "Stair openings," and a corresponding "Restraint." For example, the plan provides, in part:

"1.　High foundation/retaining walls.

*"Restraint:　guardrails*[.]

"2.　Ladders (any type), interior or exterior.

*"Restraint:　secure ladders to structure, insuring stability.*

"3.　Second floor decks.

*"Restraint:　guardrails*[.]"

(Emphasis in original.) Under that list, a section labeled "Procedures for Assembly" provides that the "proper procedure for assembly of fall arrest/restraint equipment will be found in the related" subcontractor's fall-protection plan and according to the manufacturer's recommended procedures. Another part of the Polygon manual states that its construction superintendents "[w]ill know and enforce" its fall-protection plan. Polygon did not provide the internal safety manual to Wood Mechanix.[3]

Polygon's role on the project was to manage the construction of the townhouses, which included managing the site, budget, schedule, and general safety of the project. Polygon's employees were at the site every day, and its superintendents would perform daily site walks. If they saw a safety violation, such as a worker without a hard hat or a missing guardrail, Polygon's superintendents would direct the person to stop the dangerous activity or tell the subcontractor to fix the problem. In addition, and pursuant to the contract, Polygon held weekly meetings with subcontractors on the project. Brennan Taylor, one of Polygon's superintendents, testified that the purpose of those weekly meetings was to "[g]o over a schedule, any issues amongst *** the

---

[3] In his reply brief, plaintiff states, without citation to the record, that Polygon gave the developer's Fall Protection Plan to subcontractors. However, the record does not support that statement of the facts. Thomas Landshulz, Polygon's Risk Manager at the time, testified that Polygon did not provide its internal manual to subcontractors, and Trytko testified that he was not familiar with Polygon's manual and could not say that he had ever seen it before. Furthermore, Trytko testified that Polygon did not tell Wood Mechanix to use guardrails versus any other form of fall protection and that Wood Mechanix's decision to use guardrails was its decision alone.

plans and * * * on different subcontractors. If somebody was caught without a hard hat, it would be brought up, 'You must wear your hard hat, must'—but it was more—it was scheduling and day-to-day activities." Wood Mechanix held a separate safety meeting for its employees each week.

In 2006, plaintiff was working for Wood Mechanix as a framer on the project when he fell from the third floor of one of the buildings and was injured. Earlier that day, a Polygon employee had told plaintiff to put his hard hat on and to "go up there and finish something," in reference to the building. Plaintiff went to the third floor of the building and began framing an exterior wall. Plaintiff finished placing sheetrock on a section of the wall that was going to be raised and attached, and he was kneeling down, facing a guardrail. In an effort to push himself up to a standing position, plaintiff leaned against the guardrail, and it gave way, causing him to fall 19 feet to the concrete surface below. At the time of his fall, there were no Polygon employees on the third floor of the building.

Following his injury, plaintiff filed this action against Polygon, alleging that it was liable under the ELL as his "indirect employer" and was liable for common-law negligence. Specifically, plaintiff alleged in his ELL claim that Polygon was negligent and liable for numerous failures:

"a.  In failing to require and utilize a guardrail system that was effective in preventing falls;

"b.  In failing to have a guardrail system that was effectively anchored on both ends;

"c.  In failing to have a guardrail system that could withstand 200 pounds of pressure;

"d.  In failing to warn plaintiff that he was working in an area where the guardrail system was inadequate;

"e.  In failing to use every device, care and precaution that was practicable to use for the protection and safety of life and limb, in violation of Oregon's Employer Liability Law pursuant to ORS 654.305."

In his negligence claim, plaintiff alleged that Polygon "was negligent in failing to adequately control and supervise the work" for the same reasons.

Polygon moved for summary judgment on both of those claims, arguing that (1) it was not subject to the ELL because it did not control the guardrails and (2) it was not liable in negligence because it did not owe plaintiff a duty given that it was entitled to rely on Wood Mechanix's knowledge and expertise in framing the buildings. Plaintiff responded by submitting evidence that, in his view, created genuine issues of material fact with respect to whether the ELL applied to Polygon. Plaintiff's response to Polygon's motion for summary judgment did not respond to Polygon's arguments regarding his common-law negligence claim.

The trial court granted Polygon's motion as to both of plaintiff's claims. It concluded that the summary judgment record did not establish that there were genuine issues of material fact for trial and that Polygon was entitled to prevail as a matter of law. The court thereafter entered a general judgment in favor of Polygon, which plaintiff now appeals.

## II.  STANDARD OF REVIEW

We will affirm a trial court's ruling granting a party's motion for summary judgment if there is no genuine issue of material fact and the moving party was entitled to judgment as a matter of law. ORCP 47 C. "There is no genuine issue of material fact if, based on the record before the court viewed in a manner most favorable to the nonmoving party, here plaintiff, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment." *Shell v. Schollander Companies, Inc.*, 265 Or App 624, 626, 336 P3d 624 (2014) (citing ORCP 47 C).

## III.  PLAINTIFF'S ELL CLAIM

Plaintiff first assigns error to the trial court's grant of summary judgment in favor of Polygon on his ELL claim. Plaintiff argues that the trial court erred in concluding that he had failed to present evidence from which a reasonable juror could conclude that Polygon exercised the control necessary to bring it within the ELL. We disagree.

The ELL is a statute that imposes a higher standard of care on employers who are engaged in dangerous

lines of work. ORS 654.305.[4] The purpose of the ELL is to provide workers who are engaged in those lines of work with maximum protection from injury. *Wilson v. P.G.E. Company*, 252 Or 385, 395, 448 P2d 562 (1968). The ELL accomplishes that purpose by requiring persons "having charge of, or responsibility for" dangerous work to "use every device, care and precaution that is practicable" to protect those employees. ORS 654.305.

Thus, to sustain an ELL claim, a plaintiff must prove that the defendant had charge of, or responsibility for, the dangerous work. That requirement has been interpreted in terms of a defendant's control over the work. *Wilson*, 252 Or at 390. When, as is the case here, the defendant is not the plaintiff's direct employer, the plaintiff can prove the necessary control by demonstrating that (1) the defendant and the plaintiff's direct employer were engaged in a "common enterprise"; (2) the defendant retained the right to control the manner or method in which the risk-producing activity was performed; or (3) the defendant actually controlled the manner or method in which the risk-producing activity was performed. *Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 160, 61 P3d 918 (2003).

Each of those tests considers whether the defendant had a sufficient degree of control over the dangerous work such that the defendant will be subject to the heightened standard of care under the ELL. To make that determination, it is necessary to first identify the work involving a risk or danger over which the defendant must have had control.

That determination is guided by the Oregon Supreme Court's decision in *Woodbury*, in which the court considered how to define the scope of "work involving a risk or danger" under the ELL. 335 Or at 161. In *Woodbury*,

---

[4] ORS 654.305 provides:

"Generally, all owners, contractors or subcontractors and other persons having charge of, or responsibility for, any work involving a risk or danger to the employees or the public shall use every device, care and precaution that is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices."

the defendant had instructed the plaintiff's employer to install a water pipe. *Id.* at 157. Most of the pipeline had been installed underground, but the last few feet of the pipe had to be installed over a sunken stairway and corridor. The plaintiff's employer had constructed a wooden platform to facilitate the installation of that section of the pipeline. After that section of pipe had been installed, the plaintiff was dismantling the platform and lost his balance while he was attempting to move one of the boards from the platform, causing him to fall onto the corridor below. *Id.* at 158. Relying on our decision in *George v. Myers*, 169 Or App 472, 10 P3d 265 (2000), *rev den*, 331 Or 692 (2001), we held that the scope of the work involving a risk or danger should be narrowly construed to be the discrete activity that precipitated the plaintiff's accident. *Woodbury v. CH2M Hill, Inc.*, 173 Or App 171, 181, 21 P3d 153 (2001), *rev'd*, 335 Or 154, 61 P3d 918 (2003). We concluded that, in that case, "what precipitated plaintiff's accident was his attempt to move boards to facilitate the disassembly of the platform. It was not more generally the construction of the platform or the 'work over the stairwell.'" *Id.*

On review, the Supreme Court rejected our narrow construction of the risk-producing activity based on its interpretation of the phrase "any work involving a risk or danger to the employees" in ORS 654.305. *Woodbury*, 335 Or at 161. The court began by concluding that the phrase "any work" refers to "the tasks in which the employee was engaged." *Id.* Next, it explained that the phrase "involving a risk or danger" modifies "any work," meaning that, to determine the relevant scope of the work under the ELL, one must first determine whether the work involved a risk or danger to the employee. *Id.* After looking at the contemporary definitions of "risk" and "danger," the court concluded that, as those terms are used in the ELL, they mean "the conditions of the work that create the possibility that a worker will suffer harm." *Id.*

With that understanding of the phrase "any work involving a risk or danger," the court concluded that our description of the work as moving the boards to facilitate disassembly of the platform was "neither complete nor accurate." *Id.* The court explained:

"While moving the boards, plaintiff was working at a dangerous height over a concrete surface. That height created a constant risk of harm to the employees working on that section of the pipeline. During that part of the project, the risk was reduced by building a platform on which plaintiff could stand while installing that section of the pipeline. The work included both the assembly and disassembly of the platform. The height of the work posed a risk of injury to the employees while the platform was assembled, while it was used to complete the project, and while it was disassembled. The risk of falling, then, was the most obvious potential and foreseeable danger during the installation of that section of the pipeline. We conclude that, under these facts, the 'work involving a risk or danger' included requiring plaintiff to work at height during the assembly, use, and disassembly of the platform."

*Id.* at 161-62.

In a number of our cases since *Woodbury*, we have recognized that requiring a worker to perform tasks at a height poses a risk or danger and have defined the dangerous work accordingly. For example, in *Spain v. Jones*, 257 Or App 777, 308 P3d 257, *rev den*, 354 Or 656 (2013), the plaintiff, a plumber, fell from the second story of a house while walking along an unprotected hallway. Applying *Woodbury*, we concluded that the "work involving a risk or danger" included "not only plaintiff's installation of plumbing fixtures on the second floor, but also his walk along the unprotected second-floor hallway." *Spain*, 257 Or App at 794 (internal quotation marks omitted); *see also Moe v. Eugene Zurbrugg Construction Co.*, 202 Or App 577, 585, 123 P3d 338 (2005) (concluding that, in a case in which the plaintiff fell from scaffolding while installing ceiling tiles, the "work involving a risk or danger" included requiring the plaintiff to work above open trenches during installation of the ceiling tiles).

Similarly, here, plaintiff's job as a framer required him to perform tasks at significant heights, including on the third floor of a building. That work created a risk or danger of falling onto the concrete surface below. Properly understood, the dangerous work, or the "risk-producing activity," *Woodbury*, 335 Or at 160, in this case was plaintiff's framing work at a dangerous height above a concrete surface,

including the task of cladding an exterior wall segment that was to be tipped up and placed at the perimeter of the third-floor deck.

With that understanding of the scope of the risk-producing activity in mind, we next consider whether plaintiff presented evidence from which a reasonable jury could conclude that Polygon exercised control over that activity under the three tests mentioned above. As explained below, we conclude that the evidence is insufficient under all three tests.

## A. The "common enterprise" test

A "common enterprise" exists when "(1) the plaintiff's direct employer and the defendant participate in a project of which the defendant's operations were integral or component parts; (2) the work involved a risk or danger to the employees or public; (3) the plaintiff was an adopted or intermingled employee of the defendant; and (4) the defendant had charge of, or responsibility for, the activity or instrumentality that caused the plaintiff's injury."

*Cortez v. Nacco Materials Handling Group*, 248 Or App 435, 446, 274 P3d 202 (2012), *rev'd on other grounds*, 356 Or 254, 337 P3d 111 (2014).

Under that test, "control or charge over the particular employee injured is not required to invoke the [ELL], but control or charge over the activity or instrumentality that causes the injury is." *Sacher v. Bohemia, Inc.*, 302 Or 477, 486, 731 P2d 434 (1987) (footnote omitted). "[T]here must be a causal link between the defendant's involvement in joint work and the plaintiff's injury." *Brown v. Boise-Cascade Corp.*, 150 Or App 391, 397, 946 P2d 324 (1997), *rev den*, 327 Or 317 (1998). Thus, ELL liability is triggered only if, "as [a] result of the activities of defendant's employees or use of his equipment, a risk of danger is created which contributes to an injury to plaintiff." *Wilson*, 252 Or at 391.

For example, in *Brown*, the defendant had hired the plaintiff's employer to paint its paper mill. 150 Or App at 393. The defendant's employees were also involved in painting portions of the mill. The plaintiff was injured when he fell from a roof as he was painting in one of the rooms of

the mill. *Id.* at 394. The plaintiff sued the defendant, alleging that the defendant was liable under the ELL for failing to take certain safety measures. *Id.* We concluded that the record did not permit imposition of ELL liability under the "common enterprise" test because the defendant's involvement in the painting project had no causal relationship to the plaintiff's injury. *Id.* at 397. In particular, we noted that there was no evidence that the defendant's employees were involved in painting in the room in which the plaintiff was injured, or that the plaintiff's injury resulted from defective equipment provided by the defendant. *Id.*

Similarly, in *Sacher*, the Supreme Court concluded that there was no "common enterprise" because there was no evidence that the defendant had been in charge of, or responsible for, the part of the machine that had caused the plaintiff's injury. 302 Or at 487. In that case, the plaintiff worked for Cascade, a company that manufactured broom handles. *Id.* at 479. Cascade had contracted with the defendant, a lumber producer, to install and operate a broom handle production line at one of the defendant's mills. *Id.* at 480. The plaintiff was injured when he attempted to remove a piece of wood that was jammed in the saw blades of Cascade's production line. *Id.* at 481.

The Supreme Court concluded that, despite the fact that the defendant's employees assisted in Cascade's operation by forklifting completed bins of broom handles to the yard for loading, sharpening Cascade's saws, and producing the scrap wood that Cascade used for making the handles, those facts did not meet the requirements of the "common enterprise" test. *Sacher*, 302 Or at 487. The court explained that the "dispositive factor" in that case was that there was "no evidence that [the defendant] was in charge of or responsible for that part of the handle blank production operation that caused plaintiff's injury." *Id.* Instead, the court pointed out, "Cascade alone designed, built, installed and operated the saw unit. They provided their own labor, maintenance, supplies and paid for their own utilities," and the plaintiff "was not injured because of a failure on [the defendant's] part to take proper precautions regarding its own equipment * * * or employees." *Id.* (footnote omitted).

In this case, we conclude that plaintiff failed to present evidence from which a reasonable jury could conclude that Polygon and Wood Mechanix were engaged in a "common enterprise" under the ELL. As in *Sacher*, there is no evidence that Polygon was in charge of, or responsible for, the guardrail that caused plaintiff's injury. In particular, the evidence presented by plaintiff does not demonstrate that he was injured due to some failure on the part of Polygon to take proper precautions regarding its own equipment or employees. As in *Brown*, there is no evidence that Polygon employees were involved in framing the building that plaintiff fell from or that plaintiff's injury resulted from defective equipment provided by Polygon. Instead, the uncontroverted evidence demonstrates that Wood Mechanix alone was in charge of framing the building and was responsible for providing, designing, and maintaining the guardrails.

Plaintiff nonetheless argues that a jury could conclude that Polygon was responsible for assuring that the guardrails were sufficient and secure, based on the testimony of several Polygon employees, and that he, like the plaintiff in *German v. Murphy*, 146 Or App 349, 932 P2d 580 (1997), was entitled to a trial. Plaintiff contends that the facts of this case are similar to those in *German*, in which we concluded that there was sufficient evidence of a "common enterprise." In that case, the owner of a building had hired the plaintiff's employer, Murphy, to perform demolition work. 146 Or App at 351. The owner had also hired the defendant to reconstruct and remodel the building. The plaintiff was injured when he fell through a hole in the roof. *Id.* The summary judgment record revealed that the defendant's superintendent had instructed Murphy's employees on how to make their work areas safe and how to cover holes in the roof properly; that the defendant had instructed workers, days before the accident, to cut openings in the roof; and that the defendant had directed an employee to cover holes on the roof other than the one through which the plaintiff had fallen. *Id.* at 356. We concluded that all of that was evidence that the defendant had charge of, or responsibility for, the instrumentality that caused the plaintiff's injury. *Id.*

Here, however, the facts are unlike those in *German*, and the testimony that plaintiff cites does not reasonably

lead to the inference that he would like to draw, namely, that Polygon's employees were responsible for assuring that the guardrails were sufficient and secure. Specifically, although plaintiff asserts that three "Polygon employees admitted to having responsibility over assuring the guardrails, the mechanism of plaintiff's injuries, were sufficient and secure," their testimony falls far short of such an admission.

First, plaintiff points to the testimony of Christopher Mallett, project manager for Polygon. Mallett testified that, when Polygon employees walked around the project site, they were concerned with safety and would bring safety issues they observed to the attention of the responsible subcontractor:

"Q.  When a [Polygon] team member is walking around the site, safety is one of their primary concerns—

"A.  Yes.

"* * * * *

"Q.  So if they see a gap, whenever it is, or they see a * * * railing not in compliance, whenever that is, they would take action, right?

"A.  Yeah. If you saw something that didn't appear to be compliant, whether it was a guardrail or an open trench or a hole in the floor, excuse me, or a piece—a stack of material that would seem to be unsafe or could fall over—I mean there would be probably literally hundreds and hundreds of * * * items * * * that may attract your attention and you may need to bring to the attention of the subcontractor responsible for that work.

"Q.  Okay. Did you personally ever do that, bring to the attention of a subcontractor on the Tanasbourne site—

"A.  I don't remember."

Second, plaintiff relies on the testimony of Taylor, a Polygon superintendent. Taylor stated that he was responsible for managing, among other things, general safety and would point out obvious safety problems:

"A.  We were responsible for managing site, schedule, budgets, and general safety. I mean so if I was told—if a guy didn't have a hard hat on, I was told to make sure he

gets a hard hat on. If he's running around without a shirt on, put a shirt on. If he's doing something that's obvious that I could tell was done wrong, then we were to correct that, or make a recommendation to correct that.

"Q. Mr. Walther [one of Polygon's project managers] was deposed yesterday and he gave a few examples of something similar to this.

"So I asked him if he saw a worker riding on the forks of a forklift, he would direct that person and the driver to stop that right then.

"Does that square with what you believe you would have done?

"A. Yes."

Finally, plaintiff notes, James Tyler Marsh, another Polygon employee, testified that he was told that the framing subcontractor would put safety measures in place and that he would look up to verify whether something resembling guardrails were in place:

"Q. I mean you'd actually—somebody is building them, you would see that they were building them?

"A. I would verify that they were in place, yes.

"* * * * *

"A. We were instructed that the framing subcontractor would put all the safety measures in place.

"Q. And so that it was just none of your business, you didn't even have to care?

"* * * * *

"Q. Well, did you care how they were built?

"A. I would simply look up and see if it appeared something was in place, and that was about where it stopped.

"Q. All right. Now, let's drill down a little bit on that, because I asked you if you'd know whether it was constructed properly and you said you wouldn't have a clue.

"A. I wouldn't.

"Q. So what were you looking for?

"A. Something that resembled it.

"Q.   Resembled what?

"A.   A guardrail, some kind of fall protection."

That testimony of Polygon's employees can be fairly summed up as affirmation of their concern about safety on the project site and acknowledgment that they would point out obvious safety problems to subcontractors. At most, a jury could conclude from that testimony that Polygon's employees would, from the ground, look up to see that guardrails were in place, and, if they were not, they would tell the subcontractor to put them up. There is no evidence that a Polygon employee was responsible for directing how the guardrails were placed, which would have brought the circumstances closer to the facts in *German*, or for going up to the third floor and checking that the guardrail that caused plaintiff's injury was sufficiently secure. We conclude that, on this record, a reasonable juror could not infer that Polygon was responsible for securing the guardrail or for its sufficiency.

Additionally, the fact that a Polygon employee told plaintiff on the day of his injury to go up and work on the building from which he eventually fell is also insufficient to meet the requirement for establishing a "common enterprise" between Polygon and Wood Mechanix. That is because that action did not create a risk of danger that contributed to plaintiff's injury. For example, in *German*, the defendant had instructed employees to cover certain holes in the roof, but not the hole that the plaintiff eventually fell through. The defendant's actions—covering some, but not all holes in the roof—created a risk of danger (falling through an uncovered hole) that contributed to the plaintiff's injury. The same cannot be said about Polygon's employee telling plaintiff to "finish something" in this case. All told, plaintiff failed to present sufficient evidence from which a jury could conclude that Polygon was engaged in a "common enterprise" with Wood Mechanix.

B.   *The retained right to control test*

Nor did plaintiff present evidence from which a jury could reasonably conclude that Polygon retained the right to control the manner or method in which the risk-producing activity (working at a dangerous height) was performed.

*Woodbury*, 335 Or at 160. To establish that a defendant retained the right to control the risk-producing activity, the plaintiff must "identify some source of legal authority for that perceived right or evidence from which a retained right could be inferred." *Cortez v. Nacco Materials Handling Group*, 356 Or 254, 274, 337 P3d 111 (2014) (internal quotation marks omitted).

In addition to there having to be a right to control the risk-producing activity, the Oregon Supreme Court has indicated that the defendant's right to control the work has to relate to the creation of a risk of danger to employees. *Wilson*, 252 Or at 395-96. In *Wilson*, the court explained that retaining the right to control the work does not, in and of itself, trigger duties under the ELL:

> "When deciding whether an owner's retention of control over the work of a contractor will impose upon the owner the duties specified in the [ELL], inquiry must be made concerning the kind of control retained. \* \* \* The nature of the control that will impose liability in a given circumstance depends upon what the law is attempting to accomplish by the imposition of the liability in question.
>
> "The purpose of the [ELL] is the maximum protection of workmen engaged in hazardous occupations. Therefore, before the retained right of control by an owner should give rise to liability, that retained right of control should bear some relation to the creation of a risk of danger to workmen resulting from dangerous working conditions."

*Id.* (emphasis in original).

For example, in *Wilson*, the defendant contracted with Tyee to construct an electrical transmission line. 252 Or at 389. Tyee, in turn, subcontracted the construction of the towers supporting the line to King, the plaintiff's employer. The plaintiff was injured when, as he walked out on an arm of one of the towers, it gave way and he fell. *Id.* at 389-90. The plaintiff sued the defendant under the ELL. On appeal, the Supreme Court considered whether the defendant's retained right to control the work was sufficient to bring the defendant within the ELL. *Id.* at 392. Under the contract, Tyee had to take "all necessary precautions to protect construction crews from hazards due to energized circuits in

the vicinity of the construction," and had to "maintain an active safety program," "conduct the work with due regard to safety and sanitary requirements," and "comply with all governmental safety ordinances." *Id.* at 393. The defendant, however, retained the contractual right to "'order [Tyee] to increase th[e] safety, efficiency, and adequacy'" of Tyee's "'methods, materials, or equipment [that] appear * * * to be unsafe, inefficient, or inadequate for securing the safety of the workmen.'" *Id.* at 394 (emphasis omitted). The plaintiff argued that, "because the contract gave the defendant the right to control the safety with which the work was performed, the contract also imposed" a duty under the ELL on the defendant to take precautions for the plaintiff's safety. *Id.* at 395.

The court concluded, however, that the defendant's right to take over control to attain a greater degree of safety created no risk of danger to the plaintiff and, therefore, could not trigger liability under the ELL. *Wilson*, 252 Or at 395-96. The court explained that, pursuant to the terms of the contract, Tyee was primarily responsible for the safety of the work, but the defendant "had the right to step in and exercise greater safety precautions, or to require the contractor to do so[.]" *Id.* at 396. The court then explained that, "[b]efore any such right to control would relate to the creation of a risk to plaintiff, the contract would have to create a situation where the contractor would probably be less diligent concerning safety because of an expectancy that defendant would exercise the necessary care." *Id.* Because the duty to maintain safety remained the primary duty of Tyee, the court concluded that Tyee would not have expected the defendant to exercise the necessary care. *Id.* The court also explained that "[t]he retention of the right by owners to direct the manner in which the work is done, if necessary to secure greater safety, tends to promote the same policy as that of the [ELL]." *Id.*

Additionally, contractual provisions that provide the defendant with the right to control the scope of the work, as opposed to the "manner or method" in which the work is performed, are likewise insufficient to satisfy the "retained right to control" test. For example, in *Brown*, the plaintiff

relied on the existence of a work order to establish that the defendant retained the right to control the manner or method in which the painting work was performed. 150 Or App at 398. The work order provided that "'[a]ll work is to be completed per the directions of owner's representative.'" *Id.* The contract between the plaintiff's employer, Partridge, and the defendant provided that Partridge was an independent contractor and that the defendant had no power to determine or control the manner in which Partridge performed the work. The contract also provided that the defendant would authorize Partridge to perform work by issuing a work order that would specify the scope of the work to be performed. *Id.* We concluded that "any retention of control by defendant necessarily pertained solely to the *scope* of Partridge's work—*i.e.*, what areas of the plant should be painted—and not to the 'manner or method' of Partridge's performance." *Id.* at 398 (emphasis in *Brown*). As a result, we held that there was no basis for "retained control" liability. *Id.*

Here, plaintiff argues that there is evidence from which a jury could find that Polygon retained the right to control safety on the job site. Specifically, plaintiff relies on the following facts to support his argument: (1) Polygon could terminate the contract with Wood Mechanix if it was not satisfied with its safety practices and (2) Polygon "continually exercised its ability to supervise and control safety at the job site," because it "held a weekly safety meeting with subcontractors * * * in part to discuss safety issues" and several Polygon employees "stated they reserved the right to correct safety violations if they were observed on the site." Plaintiff also argues that a jury could find that Polygon reserved the right to control the specific means that Wood Mechanix would use to protect its workers because the contract required Wood Mechanix to submit its safety plan to Polygon before beginning work on the site and the contract had to be completed to the "full and complete" satisfaction of Polygon. We conclude, however, that the control that Polygon retained over job-site safety is insufficient to trigger retained-control liability under the ELL.

Here, as in *Wilson*, the contract between Polygon and Wood Mechanix placed the primary responsibility for safety on Wood Mechanix. Though the contract stated that

Polygon was committed to maintaining a safe work place, the terms of the contract specified that it was Wood Mechanix that agreed to take "necessary safety and other precautions, at all times, to prepare for and perform the work in a safe manner and to protect persons from \*\*\* injury \*\*\* arising out of the performance of the work." Moreover, the contract provided that Wood Mechanix would "at all times, be responsible for providing a safe work site and be responsible for the safety" of its employees and equipment.

Also, as in *Wilson*, Polygon retained the right to require Wood Mechanix to exercise greater safety precautions. The contract stated that, in addition to complying with applicable laws and regulations, Wood Mechanix was required to take "any safety measures requested" by Polygon. However, as the court explained in *Wilson*, Polygon's right to take control to attain greater safety at the site must relate to the creation of a risk to plaintiff, which will only be the case if the terms of the contract would have led Wood Mechanix to expect Polygon to exercise the necessary care for employee safety. We conclude that, because the terms of the contract placed primary responsibility for employee safety on Wood Mechanix, Wood Mechanix would not have expected Polygon to exercise the necessary care by virtue of Polygon's right to require additional safety measures. Accordingly, Polygon's retained right to require greater safety measures was not sufficient to constitute a retained right to control the manner or method in which Wood Mechanix performed the risk-producing activity.

Likewise, we reject plaintiff's argument that a jury could find a retained right to control from the fact that Wood Mechanix had to submit its safety plan to Polygon before beginning work on the project. As mentioned above, plaintiff argues that the jury could infer from the contractual provisions that Polygon had the power to approve or reject the means that Wood Mechanix articulated in its safety plan, thus demonstrating that Polygon reserved the right to control the specific means used by Wood Mechanix for employee safety. But even assuming that the contract gave Polygon the power to approve or reject Wood Mechanix's safety plan, that right to control triggers liability under the ELL only if it bears some relation to the creation of a risk of danger

to Wood Mechanix's workers. We conclude that it does not. Under the terms of the contract, any right that Polygon had to approve or reject Wood Mechanix's safety plan existed prior to the work commencing. After that, Polygon's right to control Wood Mechanix's safety plan ceased, and the contract provided that Wood Mechanix was responsible for the safety of its worksite and its employees. Thus, Polygon's right to control Wood Mechanix's safety plan before work commenced did not create any expectation on the part of Wood Mechanix that Polygon would be responsible for the safety of Wood Mechanix's employees going forward. Although Polygon retained the right to tell Wood Mechanix to follow additional safety measures after that point, as we explained above, that right does not trigger liability under the ELL either.

Nor could a jury find a retained right to control from the other evidence on which plaintiff relies. The fact that Polygon could terminate Wood Mechanix's contract for repeated safety violations does not create liability under the ELL. The right of a defendant to require the plaintiff's direct employer to comply with safety requirements is insufficient to establish a retained right to control the risk-producing activity. *See Boothby v. D.R. Johnson Lumber Co.*, 184 Or App 138, 145-48, 55 P3d 113 (2002), *aff'd*, 341 Or 35, 137 P3d 699 (2006) (holding that there was no retained right to control despite the fact that the contract provided that the defendant could declare the plaintiff's employer in breach if it did not comply with safety requirements). Nor does the fact that Polygon held a weekly meeting with subcontractors or the fact that Polygon employees "stated they reserved the right to correct safety violations if they were observed on the site" satisfy the retained right to control test. Polygon's right to discuss safety issues with subcontractors and the right to tell subcontractors to correct observed safety hazards does not relate to the creation of a risk of danger to Wood Mechanix's employees. We conclude, therefore, that plaintiff has not adduced evidence sufficient for a trial under the "right to control" test.

C. *The actual control test*

We also conclude that plaintiff failed to present evidence from which a jury could conclude that the "actual

control" test had been satisfied. A defendant is subject to the ELL under the "actual control" test if the defendant actually controlled the manner or method in which the risk-producing activity was performed. *Woodbury*, 335 Or at 160. Such control requires that the defendant "advise on, or exercise some authority over," the activity or instrumentality that caused the plaintiff's injury. *Cortez*, 248 Or App at 447. Actions taken by a defendant to secure the ultimate result for which the defendant has contracted are insufficient to trigger liability under the ELL. *Wilson*, 252 Or at 398.

For example, in *Woodbury*, the evidence demonstrated that the defendant and the plaintiff's direct employer "jointly decided" to use the wooden platform to facilitate the installation of the pipeline and that the defendant had advised the plaintiff's direct employer on how the platform should be built. 335 Or at 162. The Supreme Court concluded that "there was evidence from which the jury reasonably could conclude that defendant exercised actual control both over the decision to use a wooden platform and over the choice of how that platform was constructed." *Id.* Therefore, the court concluded, "there is evidence in the record to support a jury finding that defendant exercised actual control over the manner or method in which the risk-producing activity (working at height) was performed." *Id.* at 163.

In contrast, in *Brown*, we concluded that the defendant had not exercised actual control because there was no evidence that the defendant ever told the plaintiff's employer how to paint or which equipment to use. 150 Or App at 398. The plaintiff, who fell while painting, nevertheless argued that the jury could have found that the defendant exercised actual control over the painting activities because, among other things, there was evidence that the defendant's actions precluded the plaintiff's employer from using other fall protection methods. *Id.* at 399. We explained that the "fatal deficiency" in the plaintiff's actual-control argument was that his employer, and his employer alone, "made the decision to use ladders, rather than scaffolds or manlifts, in painting the core room and that, in making that decision," the plaintiff's employer's supervisors "determined that lifts were unnecessary and that ladders were safe." *Id.*

Plaintiff argues that "[t]here are many pieces of important evidence that create questions of fact as to whether Polygon did, in fact, control the method and manner of plaintiff's work at a height." Plaintiff relies on facts similar to those he cited in regard to the "common enterprise" and "right to control" tests: (1) On the day he was injured, a Polygon employee ordered him to finish something on an upper level and ordered him to put on his hard hat. (2) Polygon reviewed the subcontractor's safety plans for adequacy and could terminate the contract if repeated safety violations were observed. (3) Polygon employees testified that part of their job was to "actively observe and correct safety violations." (4) Marsh, a Polygon superintendent, testified that he verified that guardrails were in place on the job site. (5) Polygon's internal safety manual, which contained a fall-protection plan, identified guardrails as the restraint to be used on second-floor decks. Plaintiff contends that from those facts, a jury could conclude that Polygon required Wood Mechanix to use guardrails, which would constitute actual control of the dangerous activity under the ELL. We disagree and conclude that a jury could not find, based on that evidence, that Polygon actually controlled the manner or method in which Wood Mechanix performed the risk-producing activity—framing work at a dangerous height above a concrete surface—at issue in this case.

First, the fact that a Polygon employee directed plaintiff on the day of his injury to work on one of the buildings is legally insufficient to establish actual control. ELL liability is not triggered under the actual control test when a defendant merely directs the plaintiff or the plaintiff's employer to do dangerous work. Rather, it is only triggered if the defendant actually controls the manner or method—*i.e.*, *how*—the plaintiff or the plaintiff's employer performs that work. *See Wilson*, 252 Or at 398 (concluding that the defendant had not exercised actual control over the work involving a risk or danger because the defendant's "only exercise of control was for the purpose of securing the ultimate result for which defendant had contracted," and there was "no evidence of an attempt by defendant to control the method and manner of the work"). For the same reason, the fact that Polygon had reviewed Wood Mechanix's safety plan does not

establish actual control because there is no evidence to suggest that, in reviewing the plan, Polygon actually told Wood Mechanix *how* to perform its work.

Additionally, plaintiff's reliance on the fact that Polygon could terminate the contract for safety violations is unavailing. The actual-control test requires the defendant to have *actually* controlled the way the work was done. A jury could not reasonably conclude that Polygon actually controlled the way Wood Mechanix performed its work by virtue of its right to terminate the contract for safety violations.

We also reject plaintiff's argument that the fact that Polygon employees would verify that guardrails were in place and bring observed hazards to the attention of the subcontractors is evidence of Polygon's actual control. That is because there is no evidence that Polygon employees instructed Wood Mechanix on *how* to construct, maintain, or fix the guardrails.

Finally, we conclude that a jury could not reasonably infer that Polygon required Wood Mechanix to use guardrails. Although plaintiff relies on the fall-protection plan contained in Polygon's internal safety manual and asserts that it is given to subcontractors and requires that guardrails be used, as noted earlier, plaintiff has not adduced evidence that the safety manual was ever given to Wood Mechanix. Nor is there any evidence that Polygon ever told Wood Mechanix that it had to use guardrails as opposed to any other form of fall protection. To the contrary, Trytko, Wood Mechanix's owner, testified that Wood Mechanix, and Wood Mechanix alone, decided to use guardrails and that Polygon did not instruct them on how to build them. Even when viewed in a light most favorable to plaintiff, the facts do not support plaintiff's assertion that Polygon required Wood Mechanix to use guardrails.

To summarize, we conclude that plaintiff failed to present evidence creating a genuine issue of material fact as to whether Polygon was his "indirect employer" and therefore was subject to the ELL. Accordingly, we conclude that Polygon was entitled to a judgment as a matter of law on plaintiff's ELL claim and that the trial court did not err in

granting Polygon's motion for summary judgment on that claim.

## IV. PLAINTIFF'S COMMON-LAW NEGLIGENCE CLAIM

We now turn to plaintiff's second assignment of error, in which he challenges the trial court's grant of summary judgment to Polygon on his common-law negligence claim. In that claim, plaintiff alleged that Polygon was negligent in failing to adequately control and supervise the work. In particular, plaintiff pointed to Polygon's failure to "require and utilize a guardrail system that was effective in preventing falls," its failure to have a guardrail system that was effectively anchored on both sides and could withstand 200 pounds of pressure, as well as Polygon's failure to warn plaintiff that he was working in an area where the guardrail system was inadequate. The trial court granted Polygon's motion for summary judgment because it concluded that Polygon had no duty to plaintiff to discover and warn of any unknown dangerous condition of the guardrails given Polygon's right to rely on the expertise of Wood Mechanix in framing the buildings, including Wood Mechanix's use of the guardrails.

In Oregon, "unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from [a] defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987). In this case, Polygon argued that its duty to plaintiff was limited by the "special expertise or knowledge" rule, which was first announced in *Yowell v. General Tire & Rubber*, 260 Or 319, 490 P2d 145 (1971).

In *Yowell*, the defendant owned a tire business and hired the plaintiff's employer to repair or replace a sign located on its property. 260 Or at 320. The plaintiff's employer sent the plaintiff, who was an experienced sign builder, installer, and repairer, to do the work. The plaintiff was injured when a latent defect caused him to

fall while repairing the sign, and he sued the defendant for negligence.

The Supreme Court concluded that the plaintiff's negligence claim failed because the defendant did not owe the plaintiff a duty. *Yowell*, 260 Or at 324-25. The court adopted the rule that

> "[a] person who orders repairs or work to be done by a third party owes no duty to such third party or his workmen to discover and warn of any unknown dangerous conditions surrounding the work which fall within a special expertise or knowledge, not shown to have been had by the person ordering the work, and which the third party impliedly represents to the public that he possesses."

*Id.* at 325. In that case, the court explained that

> "[p]laintiff's employer, the independent contractor, held itself out to the public as being engaged in the business of manufacturing, installing and repairing all kinds of signs. Defendant was therefore entitled to assume, until notice to the contrary, that plaintiff's employer and its employees who were sent to work on defendant's signs were proficient and expert in detecting any defects in signs which formed a danger to those working in or around them. Defendant was not shown to have known of the defect in the sign. Nor was it shown to have any expertise concerning signs."

*Id.* at 324-25 (footnote omitted).

Since *Yowell*, we have extended that rule to include not only latent defects, but also obvious risks associated with the plaintiff's specialized task. For example, in *George*, the defendant hired the plaintiff's employer to perform framing work on a construction project. 169 Or App at 474. The plaintiff was injured when he fell from the third floor of a building. At the time the plaintiff fell, there was no fall protection of any kind at the construction site. *George*, 169 Or App at 475. The plaintiff sued the defendant alleging, among other things, that the defendant was negligent in failing to maintain a safe work area, failing to provide the plaintiff and his employer with necessary safety equipment, and failing to adequately inspect and supervise the work. *Id.* at 485. The defendant asserted that, because it had hired the plaintiff's employer for its expertise in framing, and because the cause

of the injury was a hazard (falling from an upper story) associated with the type of work the plaintiff was hired to perform, the defendant did not owe the plaintiff a duty to protect him from that hazard. The trial court agreed and granted the defendant's summary judgment motion. *Id.* at 476.

On appeal to this court, the plaintiff argued that the rule in *Yowell* did not apply because "the risk or hazard—the possibility of falling from the unguarded, unenclosed third-story—was obvious." *George*, 169 Or App at 486. We disagreed with the plaintiff that the *Yowell* rule did not apply to obvious risks:

> "[I]n the circumstances here, the reasons underlying *Yowell*'s overarching 'no duty' principle preclude liability. Indeed, the very obviousness of the risk—coupled with the fact that that risk was inextricably intertwined with [the plaintiff's employer's] performance of a specialized task over which defendant neither retained nor exercised control—compels that conclusion. In such circumstances, defendant was entitled to rely on [the plaintiff's employer's] 'special expertise or knowledge' with respect to the 'advisability and efficacy' of fall protection measures in framing homes—and, thus, as a matter of law, was not obligated to undertake such measures. As we suggested in *Brown*, to impose liability in such circumstances would be 'tautological[.]'
>
> "* * * * *
>
> "Here, the evidence was uncontroverted that defendant hired [the plaintiff's employer] because of its experience and specialized expertise in framing. There was no evidence that defendant had any knowledge or expertise regarding appropriate fall protection in framing multistory houses. Consequently, *Yowell*'s fundamental principle precludes liability in this case."

*Id.* at 487-88 (internal citations and footnotes omitted).

In this case, plaintiff argues that a jury could reasonably conclude, based on the evidence in the record, that Polygon did not rely solely upon the expertise of Wood Mechanix and that it had expertise in fall protection. In support of that argument, plaintiff relies on Polygon's fall-protection plan, which stated that guardrails were the

restraint for second-floor decks, and the fact that Polygon required Wood Mechanix to submit its safety plan to Polygon before beginning work on the project. Plaintiff argues that Polygon required Wood Mechanix to use guardrails and that Polygon disseminated its fall-protection plan to subcontractors on the project, which, plaintiff contends, indicates that Polygon was not relying solely upon the expertise of Wood Mechanix. However, as we explained above, there is no evidence from which a jury could find that Polygon required Wood Mechanix to use guardrails as opposed to any other method of fall protection or that Polygon gave its fall-protection plan to Wood Mechanix. We conclude that the evidence on which plaintiff relies does not create a genuine issue of fact as to Polygon's duty to plaintiff.

Here, there is uncontroverted evidence that Polygon hired Wood Mechanix for its expertise in framing the buildings. Although Polygon had a general understanding that fall protection should be in place while framing work is performed at heights, there is no evidence that Polygon possessed special knowledge or expertise regarding how to perform framing work or that Polygon had any special expertise or knowledge regarding how to design, construct, and maintain the guardrails. In addition, Polygon did not retain or exercise control over that work. Accordingly, the record reflects that, as in *George*, Polygon was entitled to rely on Wood Mechanix's expertise in framing the buildings and did not owe plaintiff a duty.

## V.   CONCLUSION

In sum, because plaintiff failed to present evidence from which a jury could reasonably conclude that Polygon was subject to the ELL or that Polygon owed plaintiff a duty, the trial court did not err in granting Polygon's motion for summary judgment on plaintiff's claims. Accordingly, we affirm the general judgment in favor of Polygon.

Affirmed.