170 August 4, 2016 No. 53

IN THE SUPREME COURT OF THE
STATE OF OREGON

Arthur YEATTS;
and Nancy Doty, Inc.,
Special Fiduciary for Arthur Yeatts,
*Petitioners on Review,*
*and*

Matthew WHITMAN,
*Plaintiff,*
*v.*

POLYGON NORTHWEST COMPANY,
a foreign corporation,
*Respondent on Review.*

(CC CV08020124; CA A150199; SC S062977)

On review from the Court of Appeals.*

Argued and submitted November 9, 2015.

J. Randolph Pickett, Pickett Dummigan LLP, Portland, argued the cause for petitioners on review. Jeffrey A. Bowersox, Bowersox Law Firm PC, Portland, filed the brief for petitioners on review. With him on the brief were J. Randolph Pickett, R. Brendan Dummigan, Kimberly O. Weingart, Ron K. Cheng, Pickett Dummigan LLP, Portland, and Scott M. Supperstein, Law Office of Scott Supperstein, P.C., Portland.

Bruce H. Cahn, Ball Janik LLP, Portland, argued the cause and filed the brief for respondent on review. With him on the brief was Amy Heverly.

W. Eugene Hallman, Pendleton, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

Before Balmer, Chief Justice; Kistler, Walters, Landau, Baldwin, and Brewer, Justices. **

_____

* Appeal from Clackamas County Circuit Court, Jeffrey S. Jones, Judge. 268 Or App 256, 341 P3d 864 (2014).

** Linder, J., retired December 31, 2015, and did not participate in the decision of this case. Nakamoto, J., did not participate in the consideration or decision of this case.

BREWER, J.

The decision of the Court of Appeals is affirmed in part and reversed in part. The decision of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.

Walters, J., concurred and filed an opinion.

**BREWER, J.**

Plaintiff, the direct employee of a subcontractor working on a construction jobsite, fell while framing the third floor of a townhome that was under construction. In this action, plaintiff brought claims for relief against the general contractor under Oregon's Employer Liability Law (ELL), ORS 654.305 to 654.336, and for common-law negligence, in which he sought damages for injuries that he suffered in the fall.

The trial court granted summary judgment in favor of the general contractor, Polygon Northwest Company (Polygon), on both of plaintiff's claims, after concluding that there were no genuine issues of material fact and that Polygon was entitled to prevail as a matter of law. On appeal, the Court of Appeals affirmed. *Yeatts v. Polygon Northwest Co.*, 268 Or App 256, 341 P3d 864 (2014). On review, we conclude that plaintiff presented sufficient evidence to withstand a motion for summary judgment on the specification of his ELL claim that Polygon retained a right to control the method or manner in which the risk-producing activity was performed. Accordingly, we reverse the Court of Appeals decision affirming the dismissal of the retained right of control specification of plaintiff's ELL claim, reverse the trial court's judgment regarding that specification, and remand that claim to the trial court for further proceedings. We affirm the decisions of the Court of Appeals and the trial court with respect to plaintiff's negligence claim and the remaining specifications of his ELL claim.

## I.   STANDARD OF REVIEW

When reviewing a trial court's grant of summary judgment, we view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the nonmoving party. *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). We therefore view the facts in the summary judgment record in the light most favorable to plaintiff.

## II.   FACTS

Polygon was the general contractor for a residential townhome development project. On behalf of the developer,

Polygon signed a contract with plaintiff's employer, Wood Mechanix, LLC (Wood Mechanix) to perform framing work on the project.[1] The contract contained numerous provisions that addressed the relationship between Wood Mechanix and Polygon. Under the heading of general terms and conditions, the contract provided that Wood Mechanix "has the status of an employer" for unemployment compensation and social security purposes. The contract required Wood Mechanix, at its own expense, to procure and maintain general liability insurance coverage and Oregon Worker's Compensation insurance for accidental bodily injury on the worksite. The contract further required Wood Mechanix to name Polygon as an additional insured under its liability insurance policy and to procure liability insurance coverage that would provide that,

> "[t]o the fullest extent permitted by law, the insurer shall defend and indemnify [Polygon] for all claims and suits arising out of, related to, or connected with [Wood Mechanix's] performance of the work, regardless of whether said claim or suit alleges, or any other entity contends, that [Polygon] was independently or concurrently negligent. Said defense and indemnity obligations shall arise specifically but not exclusively, with respect to any claim or suit arising out of circumstances where any employee or agent of [Wood Mechanix] suffers personal injuries during the performance of the work by [Wood Mechanix] or [Polygon]."

The contract also contained specific provisions that addressed safety requirements for work on the project. In particular, the contract provided:

> "4.3   Safety Requirements.

> "[Polygon] is committed to maintaining a safe work place. [Wood Mechanix] agrees to take necessary safety and other precautions, at all times, to prepare for and perform the work in a safe manner and to protect persons from illness or injury and property from damage arising out of the performance of the work. [Wood Mechanix] agrees and is responsible to ensure that all sub-tier subcontractors and suppliers adhere to the requirements of this [provision].

---

[1] The contract provided that the developer, Tanasbourne Place Townhomes, LLC, was the "Contractor," but plaintiff asserts, and Polygon does not contest, that Polygon had the same rights under the contract as the developer.

"[Wood Mechanix] shall take all necessary safety precautions pertaining to its work and the conduct thereof, including but not limited to, compliance with all applicable laws, ordinances, rules[,] regulations and orders issued by a public authority, whether federal, state, local or other, the federal Occupational Safety and Health Act, the Oregon Safe Employment Act, and any safety measures requested by [Polygon]. [Wood Mechanix] shall, at all times, be responsible for providing a safe work site and be responsible for the safety of all personnel, equipment, and materials within [Wood Mechanix's] care, custody or control. [Wood Mechanix] shall promptly provide [Polygon] with written notice of any safety hazard or violation found anywhere on or adjacent to the construction site."

The contract further provided that, "[t]o the fullest extent permitted by law, [Wood Mechanix] agrees to defend, indemnify and hold [Polygon] harmless from all OSHA claims, demands, proceedings, violations, penalties, assessments, or fines that arise out of or relate to [Wood Mechanix's] failure to comply with any safety related laws, ordinances, rules, regulations, orders, or its obligations hereunder." In addition, the contract contained an exhibit that addressed specific scope of work requirements for the framing work that Wood Mechanix was to perform. The contract provided that "[Wood Mechanix] is required to promptly and diligently provide temporary railings, braces and fall protection as may be required by the ongoing framing of the buildings [p]er OSHA requirements." The contract also required Wood Mechanix's owner to attend a meeting with Polygon's superintendent before beginning work on the project.

Also as a term of the contract, Wood Mechanix was required to develop a site-specific safety plan that identified the anticipated hazards of the framing work and the specific means that Wood Mechanix would use to address those hazards. Although the summary judgment record does not include the plan developed by Wood Mechanix, it does contain a checklist completed by Trytko, the owner of Wood Mechanix. On the checklist, Trytko confirmed that Wood Mechanix had provided its "Fall Protection Program" to Polygon and had "Fall Protection Work Plan" forms

available for each building on which it would work. Trytko confirmed that the plan:

"—Identif[ied] all fall hazards[.]

"—Describe[d] the method of fall arrest or fall restraint to be used for these hazards[.]

"—Describe[d] the correct procedures for assembly, maintenance, inspection and disassembly of the fall protection system[.]"

In his deposition testimony, Trytko stated that Wood Mechanix's employees were trained and instructed in the fall protection plan and that Wood Mechanix had a "competent and qualified person" inspect the fall-protection equipment daily. He also testified that Wood Mechanix alone made the decision to use guardrails as the form of fall protection for framing work on the project.

While the contract between Polygon and Wood Mechanix explicitly called for Wood Mechanix to assemble, maintain, and inspect the fall protection system, Polygon also established its own site-specific Accident Prevention Plan. Among other provisions, Polygon's plan provided that the fall protection restraint for second-floor and higher floors should be guardrails. That plan placed primary responsibility for assembly, maintenance and inspection of the fall protection system on its subcontractors, including Wood Mechanix. The plan stated:

"Procedures for Assembly

"The proper procedure for assembly of fall arrest/restraint equipment will be found in the related TANASBOURNE PLACE TOWNHOMES L.L.C Subcontractor's Fall Protection Work Plan and according to manufacturer's recommended procedures."

In addition, the plan required that the Fall Protection Work Plans of Polygon's subcontractors, including Wood Mechanix, must "[i]dentify all fall hazards," "[d]escribe the method of fall arrest or fall restraint to be used for these hazards," and "[d]escribe the correct procedures for assembly, maintenance, inspection and disassembly of the fall protection system."

Polygon's plan also assigned responsibility for safety protection to its own construction superintendents. Specifically, the plan provided that "[a]ll superintendents will inspect their construction sites daily for safety hazards and issue 'Safety Hazard Observed' notices to any subcontractor in violation." And the plan further provided that each "site Superintendent must advise each Subcontractor" of the requirements for the subcontractor's fall protection work plan.

Although Polygon's Accident Prevention Plan is included in the summary judgment record, the record also shows without dispute that it was disseminated only internally to Polygon employees and not to the subcontractors who worked on the project. Landshulz, Polygon's Risk Manager, testified that Polygon did not provide its plan to subcontractors, and Trytko testified that he could not state that he had ever seen Polygon's plan before this action was commenced.

The evidence also shows that Polygon relied on Wood Mechanix's expertise with respect to fall protection for the framing work. Walther, who was Polygon's first project manager, testified:

"Once again, it goes back to the—to the site contractor to—to—for this case would be to install those railings. That's why we hired them, to put them up—or that's why we hire them, to frame the building. They're taking their own safety program and critiquing it to the building or a project specific. And that's why we hire them, for the experts."

Marsh, another Polygon superintendent, also testified that Polygon relied on Wood Mechanix to properly design and construct the guardrails:

"Q.   You have no idea how a guardrail should be built?

"A.   It wasn't my job to know. I was relying on the expertise of somebody who did know."

As Marsh further explained, "[w]e were instructed that the framing subcontractor would put all the safety measures in place."

The Court of Appeals accurately summarized Polygon's role in the project—based on the summary judgment record—as follows:

"Polygon's role on the project was to manage the construction of the townhouses, which included managing the site, budget, schedule, and general safety of the project. Polygon's employees were at the site every day, and its superintendents would perform daily site walks. If they saw a safety violation, such as a worker without a hard hat or a missing guardrail, Polygon's superintendents would direct the person to stop the dangerous activity or tell the subcontractor to fix the problem. In addition, and pursuant to the contract, Polygon held weekly meetings with subcontractors on the project. *** Taylor, one of Polygon's superintendents, testified that the purpose of those weekly meetings was to '[g]o over a schedule, any issues amongst *** the plans and *** on different subcontractors. If somebody was caught without a hard hat, it would be brought up, "You must wear your hard hat, must"—but it was more—it was scheduling and day-to-day activities.' Wood Mechanix held a separate safety meeting for its employees each week."

*Yeatts*, 268 Or App at 260-61.

It was in that contractual and operational setting that plaintiff was injured while working for Wood Mechanix as a framer on the project, when he fell from the third floor of one of the townhomes. Earlier that day, a Polygon employee had told plaintiff to put his hard hat on and "go up there and finish something," in reference to the building. Plaintiff went to the third floor and began framing an exterior wall. Plaintiff finished placing sheetrock on a section of the wall that was going to be raised and attached. He was kneeling down, facing a guardrail. In an effort to push himself up to a standing position, plaintiff leaned against the guardrail, and it gave way, causing him to fall 19 feet to the concrete surface below. When plaintiff fell, no Polygon employees were on the third floor of the townhome.

After his injury, plaintiff brought this action against Polygon, asserting in separate claims that Polygon was liable for plaintiff's injuries under the ELL as plaintiff's "indirect employer" and that Polygon also was liable based on common-law negligence. Plaintiff alleged in his ELL claim that Polygon was negligent:

"a.   In failing to require and utilize a guardrail system that was effective in preventing falls;

"b.   In failing to have a guardrail system that was effectively anchored on both ends;

"c.   In failing to have a guardrail system that could withstand 200 pounds of pressure;

"d.   In failing to warn plaintiff that he was working in an area where the guardrail system was inadequate; and

"e.   In failing to use every device, care and precaution that was practicable to use for the protection and safety of life and limb, in violation of Oregon's Employer Liability Law pursuant to ORS 654.305."

In his common-law negligence claim, plaintiff alleged that Polygon "was negligent in failing to adequately control and supervise the work" for the same reasons that he asserted in his ELL claim.

Polygon moved for summary judgment on both claims. Polygon argued that it was not subject to the ELL because it did not control the guardrails and that it was not liable in negligence because it did not occupy a legal relationship toward plaintiff under which it owed a duty to ensure his personal safety. In particular, Polygon argued that it owed no duty to plaintiff because any dangerous condition associated with the guardrails fell "within the special expertise or knowledge of" Wood Mechanix. Plaintiff submitted evidence of the terms of the contract between the parties, as well as how the parties operated, that, in his view, created material issues of fact with respect to whether the ELL applied to Polygon and whether Polygon owed a safety-related duty to plaintiff as alleged in his common-law negligence claim. The trial court granted Polygon's summary judgment motion on both claims.

Plaintiff appealed the ensuing general judgment in favor of Polygon. The Court of Appeals concluded that plaintiff failed to present evidence from which a jury could find that Polygon was liable under the ELL or that Polygon was negligent. With respect to the negligence claim, the Court of Appeals relied on this court's decision in *Yowell v. General Tire & Rubber*, 260 Or 319, 490 P2d 145 (1971), in concluding, based on the summary judgment record, that Polygon was entitled to rely on Wood Mechanix's expertise in performing framing work at heights and did not owe plaintiff a

duty. *Yeatts*, 268 Or App at 283. The Court of Appeals therefore affirmed the general judgment in favor of Polygon.

## III.   ANALYSIS

### A.   *Claims under the ELL*

Oregon's ELL imposes liability on "all owners, contractors or subcontractors and other persons having charge of, or responsibility for" work involving a risk or danger. ORS 654.305. This court has held that, in addition to a worker's direct employer, liability under the ELL can be imposed on an indirect employer

> "who (1) is engaged with the plaintiff's direct employer in a 'common enterprise'; (2) retains the right to control the manner or method in which the risk-producing activity was performed; or (3) actually controls the manner or method in which the risk[-]producing activity is performed."

*Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 160, 61 P3d 918 (2003) (summarizing *Wilson v. P.G.E. Company*, 252 Or 385, 391-92, 448 P2d 562 (1968)) (footnote omitted).[2]

At the outset, we note that the parties agree that the Court of Appeals correctly identified the risk-producing activity as "plaintiff's framing work at a dangerous height above a concrete surface." Based on our review of the record, we agree with that characterization. *Cf. Woodbury*, 335 Or at 162 (describing risk-producing activity in that case as "work at height"). With that understanding in mind, we consider whether plaintiff presented sufficient evidence to create a triable issue of fact as to whether Polygon could be found liable under one or more of the categories under the ELL.

### 1.   *"Common enterprise"*

In *Wilson*, this court stated that an indirect employer may be held liable under the common enterprise category

---

[2] In *Camenzind v. Freeland Furniture Co.*, 89 Or 158, 180, 174 P 139 (1918), this court stated that "[t]he duty imposed upon the master by the [ELL] is a nondelegable duty." However, the nondelegable nature of a duty imposed by the ELL does not affect the determination of whether such a duty exists in the first instance. *See Boothby v. D.R. Johnson Lumber Co.*, 341 Or 35, 45, 137 P3d 699 (2006) ("If, as we hold, [the defendant] did not fall into any of those categories, then the ELL imposed no duty on it, nondelegable or otherwise[.]").

"where [the] defendant and [the] plaintiff's employers are simultaneously engaged in carrying out work on a common enterprise. When, as the result of the activities of [the] defendant's employees or use of his equipment, a risk of danger is created which contributes to an injury to [the] plaintiff who is the employee of another engaged in work on the same project, [the] defendant has been considered to have sufficient control over the work to be subject to the duties imposed by the [ELL]. This is so even though he might not have had actual control over the specific activity in which [the] plaintiff was engaged at the time of his injury."

*Wilson*, 252 Or at 391 (citing *Thomas v. Foglio*, 225 Or 540, 549, 385 P2d 1066 (1961)).

In *Sacher v. Bohemia, Inc.*, 302 Or 477, 485-86, 731 P2d 434 (1987), this court noted that "[t]he 'common enterprise' [category] was drawn from *Thomas*, where this court held that the [ELL] could be invoked against a third-party employer [defendant] when the third-party employer defendant and the plaintiff's employer participated in a common enterprise involving an 'intermingling of duties and responsibility' of the employees of both employers." The court stated that the participation must consist of more than a common interest in the economic benefit from the enterprise; rather,

"an employer can be regarded as 'having charge of' work where the component part of the general undertaking for which he is responsible involves any *risk-creating activity on the part of his employees* or calls for the *use of equipment over which he has control* and which, if not maintained with proper safeguards, necessarily *exposes the employees of the other employer to an unreasonable risk* in the course of carrying on the common enterprise."

*Id*. at 486 (emphasis added). In short, the common enterprise category applies in circumstances where both employees of the defendant and employees of the direct employer of the plaintiff have intermingled duties and responsibilities in performing the risk-creating activity or where equipment that the defendant controls is used in performing that activity.

In *Sacher,* the plaintiff was a direct employee of Cascade, a manufacturer of broom handles. *Id.* at 479.

Cascade contracted with the defendant, Bohemia, Inc., a lumber producer, to install and operate a broom handle production line at one of Bohemia's mills. *Id.* at 480. The plaintiff was injured when he tried to remove a piece of wood that had lodged in the saw blades of Cascade's production line. *Id.* at 481. Bohemia's employees assisted in the operation by producing the scrap wood that Cascade used for making the broom handles, supplying the conveyors used to bring the waste wood to the Cascade operation, forklifting completed bins of broom handles to the yard for loading, occasionally sharpening Cascade's saws, and having the contractual right to approve all hiring of employees to work in Cascade's broom handle operation. *Id.* at 487. Despite those connections, though, this court concluded that there was no evidence that Bohemia was engaged in a common enterprise with Cascade with respect to the broom handle production unit that caused plaintiff's injury. *Id.* The court noted that "Cascade alone designed, built, installed and operated the saw unit" and the "[p]laintiff was not injured because of a failure on Bohemia's part to take proper precautions regarding its own equipment * * * or employees." *Id.* (footnote omitted).

In this case, there was even less intermingling of work activity between the employees of Polygon and Wood Mechanix than was the case in *Sacher*. Although Polygon's employees engaged in general oversight of the construction project, employees of Wood Mechanix performed the framing work for the project on their own. The undisputed evidence shows that Wood Mechanix made its own determination to use guardrails as the form of fall protection for framing work on the upper levels of the building and that Wood Mechanix designed, assembled, and maintained the guardrail system. In addition, there is no evidence in the record that Polygon's employees were regularly present on the third floor of the building, nor were any Polygon employees or equipment present on that floor when plaintiff's injury occurred.

In short, there is no evidence that Polygon's employees or equipment were engaged or used in framing work on the project or in the design, assembly, or maintenance of the guardrail that failed. It follows that the evidence does

not give rise to a reasonable inference that Polygon and Wood Mechanix were engaged in a common enterprise with regard to the risk-producing activity that led to plaintiff's injury. We therefore affirm the decisions of the trial court and the Court of Appeals on that issue.

2. *Actual control*

In *Woodbury*, this court held, in the context of a summary judgment ruling, that there was sufficient evidence to create a triable issue of fact as to whether the defendant was liable under the ELL because it actually controlled the manner or method in which the risk-producing activity was performed. In that case, the plaintiff sought recovery for personal injuries suffered in a fall from a construction platform. Although the plaintiff worked for a subcontractor, he filed the action against the general contractor, alleging liability under the ELL and common-law negligence. The defendant's representative provided detailed on-site instructions as to how a pipeline should be constructed, and that representative addressed jointly with the plaintiff's direct employer what was required to facilitate work on the part of the pipeline that spanned an underground concrete corridor. In particular, the defendant and the plaintiff's direct employer "jointly decided to use a fixed wooden platform consisting of boards and plywood sheets." *Woodbury*, 335 Or at 162.

Based upon that active, on-site participation by the defendant's representative, this court determined that

> "there was evidence from which the jury reasonably could conclude that [the] defendant exercised actual control both over the decision to use a wooden platform and over the choice of how that platform was constructed. In particular, the jury could have concluded that the platform was constructed without fall protection that might have protected [the] plaintiff from injury."

*Id.* at 162-63. The court concluded that that evidence was sufficient to support a jury determination that the defendant "exercised actual control over the manner or method in which the risk-producing activity (working at height) was performed." *Id.* at 163.

Although plaintiff contends otherwise, the record in this case does not disclose the kind of active, on-site participation by Polygon that created a jury issue in *Woodbury* as to whether the defendant there actually controlled the risk-producing activity.[3] The contract between Polygon and Wood Mechanix assigned responsibility for assembling and maintaining the fall protection system to Wood Mechanix, whose employees did in fact assemble and maintain the guardrail that failed. Although Polygon's accident prevention plan called for guardrails to be used for fall protection, Trytko's undisputed testimony indicated that the decision to use guardrails for fall protection was made by Wood Mechanix itself and not mandated by Polygon. In addition, the record shows that Polygon's site superintendents only inspected for obvious safety violations—such as failures of workers to wear hard hats or missing guardrails—on their daily site rounds; they did not actually physically inspect the guardrails to determine whether they were properly assembled and maintained, nor is there any evidence that Polygon otherwise actually controlled the method or manner of Wood Mechanix's framing work.[4]

Accordingly, we conclude that plaintiff did not present sufficient evidence that Polygon actually controlled the framing work at a dangerous height above the concrete surface to withstand defendant's motion for summary judgment. We therefore affirm the decisions of the trial court

---

[3] We agree with the Court of Appeals that the fact that a Polygon employee directed plaintiff on the day of his injury to work on one of the buildings is insufficient to establish actual control. *Yeatts*, 268 Or App at 278. Liability under the actual control test is only triggered if the defendant actually controls the manner or method—that is, how—the plaintiff or the plaintiff's employer performs the risk-producing activity. *See Wilson*, 252 Or at 398 (concluding that defendant had not exercised actual control over work involving risk or danger because defendant's "only exercise of control was for the purpose of securing the ultimate result for which defendant had contracted," and there was "no evidence of an attempt by defendant to control the method and manner of the work").

[4] The fact that Polygon contractually required Wood Mechanix to comply with OSHA fall protection requirements does not amount to the sort of active, on-site activity that would support a determination that Polygon actually controlled the risk-producing activity at issue. *See Boothby*, 341 Or at 43-44 (contractual provision requiring subcontractor to comply with all applicable statutes, regulations, and laws not sufficient to establish actual control or retained right of control for purposes of ELL).

and the Court of Appeals based on the actual control speci-
fication of plaintiff's ELL claim.

   3.   *Retained right to control*

      To establish that Polygon "retained the right to con-
trol" the pertinent risk-producing activity, plaintiff must
"identify some source of legal authority for that perceived
right" or present evidence from which a retained right of
control can be inferred. *Boothby v. D.R. Johnson Lumber
Co.*, 341 Or 35, 41, 137 P3d 699 (2006). In *Boothby*, this
court focused its analysis of that issue on the terms of the
contract between the defendant and its independent contrac-
tor, who was the direct employer of the plaintiff. *Id.* We also
do so here, as well as considering evidence about the manner
in which the contract was performed.

      As discussed, several provisions of the contract
between Polygon and Wood Mechanix assigned primary
responsibility to Wood Mechanix for the framing work—
including related fall protection—on the project. In par-
ticular, the contract required Wood Mechanix to provide
railings, braces, and fall protection for the framing work
in accordance with OSHA requirements. The contract
also required Wood Mechanix to develop and implement a
site-specific safety plan that identified and anticipated haz-
ards and provided specific means to address those hazards,
including fall protection. Also as discussed, Wood Mechanix
made its own decision to use guardrails as the form of fall
protection on the upper floors of the buildings, and Wood
Mechanix was responsible for assembling and maintain-
ing the guardrails. In addition, the contract required Wood
Mechanix to defend, indemnify, and provide liability insur-
ance coverage to protect Polygon from liability for injuries to
Wood Mechanix employees working on the project. In short,
the contract made Wood Mechanix primarily responsible
for safety measures for the framing work and required it to
protect Polygon from liability for injuries that might befall
Wood Mechanix employees doing that work.

      However, the contract also included provisions
under which Polygon retained some right to control the
framing work, including related safety matters. In particu-
lar, the contract provided that:

"[Wood Mechanix] shall take all necessary safety precautions pertaining to its work and the conduct thereof, including but not limited to, compliance with all applicable laws, ordinances, rules[,] regulations and orders issued by a public authority, whether federal, state, local or other, the federal Occupational Safety and Health Act, the Oregon Safe Employment Act, *and any safety measures requested by [Polygon]*."

(Emphasis added.) That provision permitted Polygon to require safety measures that it deemed appropriate beyond those necessary to comply with applicable state and federal laws; it correspondingly conferred discretion on Polygon to determine for itself whether any additional safety measures should be taken.

In addition, Polygon's Accident Prevention Plan provided that Polygon's superintendents would inspect the construction site daily for safety hazards and issue safety hazard notices to any subcontractor in violation. Although that plan was not disseminated to Wood Mechanix, consistently with the contract itself, it reinforces the point that Polygon retained the right to inspect and ensure the integrity of the guardrails as adequate fall protection measures, if it chose to do so.

Against that evidentiary backdrop, we return to the governing legal principles. In *Wilson*, a property owner hired a general contractor to build an electric transmission line; the general contractor, in turn, hired an independent contractor to construct the towers supporting the line. 252 Or at 389. Under the subcontract, the independent contractor was responsible for the method and manner in which the risk-producing activity was performed. *Id.* at 392-94. The owner, however, retained the contractual right to "increase th[e] safety, efficiency, and adequacy" of the independent contractor's methods "[i]f at any time the Contractor's methods *** appear to the [owner] to be unsafe." *Id.* at 394 (quoting the contract) (emphasis omitted).

As this court explained in *Cortez v. Nacco Materials Handling Group*, 356 Or 254, 337 P3d 111 (2014):

"The contractual right that the owner retained in *Wilson*, as the court characterized it, was limited to

requiring greater safety procedures than those that the contractor had put in place, and the question in *Wilson* was whether the owner's retention of that right was sufficient to make it liable under the ELL. The court held that it was not, for three related reasons. First, the court explained that, in order for an owner's retained right to give rise to liability under the ELL, the right had to 'bear some relation to the *creation* of a risk of danger to work[ers] resulting from dangerous working conditions.' Under the terms of the parties' contract, however, the independent contractor was responsible for the manner or methods in which the risk-producing activity was performed. Second, although the owner retained the right to require greater safety procedures, the court explained that the retention of that right 'created no risk of danger to [the] plaintiff.' The court reasoned that the retention of that right would create a risk of danger to the plaintiff only if it caused the independent contractor to be less diligent regarding safety, a possibility that the court discounted because 'the duty to maintain safety remained the primary duty of the contractor.' Finally, the court reasoned that imposing liability on owners for retaining a contractual right to require greater safety measures would serve as a disincentive to including such clauses in future contracts and thus would be contrary to the purposes underlying the ELL."

*Cortez,* 356 Or at 275-76 (emphasis in original; citations omitted).

In *Cortez,* an injured worker brought negligence and ELL claims against the sole member of a limited liability company (LLC). In that case—also decided on summary judgment—the LLC was the plaintiff's direct employer. *Id.* at 256 An officer of the sole member of the LLC acknowledged that the member "could have made all of th[e safety] changes" that it later made after the plaintiff's accident at the point at which it had first acquired the LLC. *Id.* at 274. Similarly, the officer agreed "that[,] if the [member] wanted to change either the design or the equipment used in the yard at [the LLC operation], they could do that." *Id.* at 275. This court concluded that

"[a] reasonable juror could infer from that evidence that, as the LLC statutes state, [the member] retained the right to manage the day-to-day operations of [the LLC], including

the operation of the forklifts and attendant safety procedures. Put differently, a reasonable juror could infer that [the member] retain[ed] the right to control the manner or method in which the risk-producing activity was performed."

*Id.* at 275 (internal quotation marks omitted; citation omitted). The defendant in *Cortez* remonstrated that *Wilson* was controlling and required a contrary conclusion. *Id.* The court disagreed; the court distinguished the circumstances involved, because *Wilson* arose in the context of an owner/independent contractor relationship, whereas *Cortez* involved a sole member-manager of an LLC that delegated day-to-day decisions to a mill manager and human resources director. *Id.* at 276.[5]

Here, *Wilson* also is distinguishable in part. Although this case, like *Wilson*, involves an independent contractor relationship, the contractual relationship and terms here differ from those in *Wilson*. First, *Wilson* involved an owner/independent contractor relationship in which the parties' expectations and roles differ from those ordinarily at play in a general/subcontractor relationship. In *Wilson*, the court stated:

"An owner who reserves the right to impose or require safety precautions for the benefit of his contractor's workmen derives no possible pecuniary benefit from the reservation because he has contracted for a finished product."

252 Or at 396. Presumably reasoning from that premise, the court also said: "[B]efore the retained right of control by an owner should give rise to liability, that retained right of control should bear some relation to the creation of a risk of danger to workmen resulting from dangerous working conditions." *Id.* at 395-95. The circumstances arguably are somewhat different where a general contractor is responsible to the owner for the performance of its own contractual obligations, which includes the work performed by the subcontractor. In that situation, it is still the owner who has "contracted for a finished product." The general contractor

---

[5] This court noted in *Cortez* that the plaintiff had not "argue[d] that *Wilson* was wrongly decided, and we assume[d] that the court's decision was correct in light of the particular contractual relationship in that case." *Id.* at 276 n 23.

remains bound to perform the work and therefore has an ongoing pecuniary incentive to avoid a risk of injury to workers on the jobsite.

Second, although the owner in *Wilson* could request greater safety measures than the contract expressly imposed on the independent contractor, the contract in that case further provided that

> "[t]he failure of the [owner] to make such demands shall not relieve the Contractor of his obligation to secure the quality, the safe conducting of the work, and the rate of progress required by the Contract; and the Contractor alone shall be and remain liable and responsible for the safety, efficiency, and adequacy of his methods, materials, working force, and equipment, irrespective of whether or not he makes any change as a result of any order or orders received from the [owner]."

*Wilson*, 252 Or at 394 (quoting the contract) (emphasis omitted). Thus, the parties expressly left ultimate responsibility for safety measures in the hands of the independent contractor. Although the owner could ask for additional safety measures, the contract provided that the independent contractor "alone" was responsible for the safety of its employees and the adequacy of its methods of work. Here, in contrast, Polygon was in overall charge of the construction project. Unlike the owner in *Wilson*, Polygon retained the right for its own construction superintendents to inspect the work site in its entirety. It also had the contractual right to impose additional safety measures, and, although the safety of its own work force was primarily the responsibility of Wood Mechanix in this case, unlike in *Wilson*, there was no express provision in the contract that purported to make Wood Mechanix alone responsible for the safety of its direct employees. Thus, unlike in *Wilson*, contractual responsibility for the safety of the subcontractor's employees was not fully shifted from the general contractor to the subcontractor in this case.

Those distinctions notwithstanding, plaintiff correctly notes that the "risk-creation" concept that this court applied in *Wilson* was not derived from a statutory construction analysis of ORS 654.305 that accords with our accepted

methodology, under which we interpret the statutory text in context, *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993), and then, to the extent we find it helpful, we consider the legislative history proffered by the parties, ORS 174.020(3). *See also State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (after considering text and context, court considers any pertinent legislative history, giving it appropriate weight).

In particular, one aspect of the analysis in *Wilson* is sufficiently problematic to require correction. As noted, this court in *Wilson* stated that, before the retention of a right of control would give rise to liability, that retained right must bear some relation to the creation of a risk of danger to workers. 252 Or at 395-96. The court then determined that the owner's retained right to require greater safety measures than those provided by the plaintiff's direct employer would not create a risk of danger to the plaintiff. *Id.* at 396. The court further stated that such a retained right would create a risk of danger to the plaintiff only if it caused the plaintiff's direct employer to be less diligent regarding safety, a possibility that the court discounted in that case because "the duty to maintain safety remained the primary duty of the contractor." *Id.* That "risk-creation" concept arose from the court's concern that imposing liability under the ELL in that situation would lead to less workplace safety by inducing complacency, which would be in direct opposition to the purpose of the ELL—the protection of workers. *Id.* ("[I]f duties not otherwise required of owners are imposed because of the reservation of a right to require safety precautions, it is obvious that owners will not actively concern themselves with the workmen's safety. As a result, the imposition of liability *** would defeat the very purpose the [ELL] was designed to accomplish.").

On further reflection, we conclude that there simply is no support in the text, context, or legislative history of the ELL for the proposition that the retained right to inspect work and require greater safety measures would only give rise to liability under the ELL if such retention created a risk of danger to the plaintiff by causing the plaintiff's direct employer to be less diligent. There is no reason to conclude

that a general contractor's right to inspect work for safety hazards is insufficient to amount to a retained right of control even where the reservation of that right does not cause the subcontractor who is primarily responsible for the work to be less diligent. To the contrary, such an inspection right creates an additional opportunity to avoid jobsite injury, even if the subcontractor has an undiminished incentive to diligently inspect its own work**.**

Under the principle of *stare decisis*, we assume that all fully considered decisions of this court were correctly decided. *Farmers Ins. Co. v. Mowry*, 350 Or 686, 692, 261 P3d 1 (2011). It is incumbent upon the party wishing to change a precedent to affirmatively persuade this court to abandon that precedent. *Id.* Various considerations may be weighed in deciding to depart from precedent, including a need to correct a past error, particularly where "an earlier case was inadequately considered or wrong when it was decided." *Id.* at 692-93 (quoting *G.L. v. Kaiser Foundation Hospitals, Inc.*, 306 Or 54, 59, 757 P2d 1347 (1988)).

In this case, we are persuaded that the above-discussed aspect of the holding in *Wilson* was incorrect when it was decided. As noted, the court in *Wilson* derived the risk-creation requirement from its concern with upholding the purpose of the ELL, but proper consideration was not given to the text, context, and history of the ELL in creating that requirement. *See Gaines*, 346 Or at 171-72. First, considering the text of the ELL, it applies to "persons having charge of, or responsibility for, any work involving a risk or danger to the employees," and it requires such persons to "use every device, care and precaution that is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices." ORS 654.305. That statute does not require that the act of having charge of or responsibility for that work *create*, by itself, an additional risk of danger to workers by causing their direct employers to be less diligent. Nor does anything in the context of ORS 654.305 or any other provision of the ELL support the existence of such a requirement.

Finally, that requirement does not comport with the enactment history of the ELL. In *Saylor v. Enterprise Electric Co.*, 106 Or 421, 212 P 477 (1923), this court considered that enactment history and the purpose of the ELL, which originally was proposed by initiative and enacted by a vote of the people in 1910.[6] 106 Or at 425. *See also* Or Laws 1911, ch 3. The original ballot title described "A bill for a law requiring protection for persons engaged in hazardous employments ***." Official Voters' Pamphlet, General Election, Nov 8, 1910, 81. The argument in favor of the measure set out in the voter's pamphlet described the lack of protections for the safety and lives of workers under the common law and asked voters to pass the ELL so that "the employer [would] be compelled to use diligence in protecting the laborer as to his life and limb." *Id.* at 85. The purpose of the ELL, therefore, was to protect employees engaged in lines of work "involving risk or danger" by imposing higher standards of care upon employers than did the common law. *See Saylor*, 106 Or at 427-28; Or Laws 1911, ch 3, § 1.

This court in *Wilson* correctly recognized that broad purpose; however, nothing in the history of the ELL—either in its enactment or in this court's decisions preceding *Wilson*—indicates that, in the case of the retained right to control workplace safety, liability will arise under the ELL only where the retained right creates an additional risk of danger to workers by causing their direct employers to be less diligent. *Wilson* incorrectly imposed that requirement, which is not grounded in the text, context, or history of the ELL. *See* ORS 174.010 (courts not to insert "what has been omitted").

This court has not often relied on that aspect of *Wilson*;[7] most recently, in *Cortez*, the court expressly dis-

---

[6] Part of section 1 of the enacted law became ORS 654.305, and the current text has not changed substantively from the original. *See* Or Laws 1911, ch 3, § 1.

[7] Only one other case relied upon the reasoning in *Wilson*. In *Wienke v. Ochoco Lumber Co.*, 276 Or 1159, 588 P2d 319 (1976), after determining that liability did not arise under the ELL because the defendant lumber company did not have the right to directly control the injury-creating activity, this court stated "another reason for holding that the [ELL] should not apply." 276 Or at 1167. Relying on the reasoning in *Wilson*, the court stated: "In addition, by no stretch of the imagination can it be argued that any risk was created that the contractor would fail in his duties of safety to his employees upon the expectation that

tinguished it, noting that the parties had not asked us to revisit the holding in that case. Rather than continue to limit the holding in *Wilson* to the facts of that case, for the foregoing reasons, we disavow that holding to the extent that it requires a plaintiff to show that a defendant's right to control a risk-producing activity created an additional risk of danger to the plaintiff by causing the plaintiff's direct employer to be less diligent.

We conclude that Polygon's retention of the rights to require additional safety measures, and to inspect the work site in its entirety, particularly in the absence of a contractual provision that placed sole responsibility for safety measures on Wood Mechanix, constituted sufficient evidence that Polygon retained the right to control the risk-producing activity so as to preclude summary judgment in favor of Polygon with respect to that specification of plaintiff's ELL claim. Accordingly, we reverse the decisions of the trial court and the Court of Appeals on the retained right of control specification of plaintiff's ELL claim and remand to the trial court for further proceedings on that specification.

B. *Common-Law Negligence Claim*

Plaintiff also asserts that the trial court and the Court of Appeals erred in concluding that plaintiff failed to adduce evidence sufficient to create a triable issue of fact with respect to his common-law negligence claim. As noted, plaintiff relies on essentially the same factual circumstances to support his negligence claim as he does for his claim under the ELL. Polygon contends that plaintiff's negligence claim fails because, under common-law principles, a general contractor does not owe a duty of care to the employees of a

---

[the] defendant would take care of such duties, because [the] defendant itself had no right to supervise the employees of the contractor." *Id.* at 1167-68. However, as the dissent in that case noted, the reliance on *Wilson* was *dictum* and not necessary to support the court's decision that the ELL did not apply. *Id.* at 1175 (Tongue, J., dissenting). Justice Tongue further accurately observed:

"It is of interest that this proposition, as set forth in *Wilson* by the writer of this majority opinion, not only interjected a completely new theory of 'non-liability' under the [ELL], but one not supported by the citation of any decisions by this or any other court and one which was completely different from the reasons urged by the defendant upon the appeal of that case."

*Id.*

subcontractor when the subcontractor is hired for its expertise in performing work in a dangerous field.

In *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987), this court explained that,

> "unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from [a] defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."

*Id.* at 17. This court in *Fazzolari* observed that liability in negligence does not extend to every failure to prevent a foreseeable injury, noting that "a status, a relationship, or a particular standard of conduct" may impose "limits" on a defendant's duty to act. *Id.*

In *Yowell*, this court set out what has been described as the "special expertise or knowledge" principle, which limits the duty of care that otherwise might be owed by an owner or general contractor where a subcontractor is hired to perform work. 260 Or at 325. In *Yowell,* the defendant owned a tire business and hired the plaintiff's employer to repair a sign located on its property. The court stated that the following principle governed the circumstances of that case:

> "A person who orders repairs or work to be done by a third party owes no duty to such third party or his workman to discover and warn of any unknown dangerous conditions surrounding the work which fall within a special expertise or knowledge, not shown to have been had by the person ordering the work, and which the third party impliedly represents to the public that he possesses."

*Id.* As that principle applied in *Yowell*, the court held:

> "Plaintiff's employer, the independent contractor, held itself out to the public as being engaged in the business of manufacturing, installing and repairing all kinds of signs. Defendant was therefore entitled to assume, until notice to the contrary, that plaintiff's employer and its employees who were sent to work on defendant's signs were proficient and expert in detecting any defects in signs which formed a danger to those working in or around them. Defendant was

not shown to have known of the defect in the sign. Nor was it shown to have had any expertise concerning signs."

*Id.* at 324-25 (footnote omitted).

Unlike in this case, the defendant hirer in *Yowell* owned the premises on which the plaintiff was injured. *Id.* at 320. In reaching its conclusion, the court in *Yowell* relied on principles involving the duty that a possessor of land owes to the employees of independent contractors hired to perform work on the premises. *Id.* at 323-24. However, the court did not rest its holding on that ground alone. Instead, the court stated:

"Regardless of whether defendant is to be viewed in its relation to plaintiff primarily as a possessor of land or as one who contracts for services, we believe the result in this case should be the same."

*Id.* at 324.[8]

In this case, plaintiff did not assert in the trial court or the Court of Appeals, nor has he asserted before this court, that the "special expertise or knowledge" principle does not apply in the context of general contractor-subcontractor relationships. Instead, plaintiff has challenged the Court of Appeals' determination, based on the summary judgment record, that Polygon relied on the expertise of Wood Mechanix. We determine whether there is sufficient evidence that Polygon owed and breached a duty of care to plaintiff to create a triable issue of fact in accordance with the parties' framing of that issue on review.[9] We conclude that the evidence is insufficient in that regard.

---

[8] The court further stated:

"We prefer to hold that the property owner *or the contractee (as the case may be)* owes no duty, rather than to hold that the independent contractor or his employees assume the risk. We also believe that the rule should be stated more broadly so that it covers not only the dangers of which the independent contractor and his employees knew but also those dangers of which they, in the exercise of their expertise, should have known."

*Id.* at 325-26 (emphasis added).

[9] The concurring opinion asserts that the "special expertise or knowledge" principle should not apply in this case because of differences that she perceives between the liability of possessors of land and general contractors for injuries suffered by an employee of an independent contractor while performing contracted work. 360 Or at 198-200 (Walters, J., concurring). Because plaintiff does not make that argument, we do not address its merits.

Here, Polygon hired plaintiff's employer as an independent subcontractor to undertake framing work, including fall protection for that work, because of its expertise in framing buildings. There is no evidence in the summary judgment record that Polygon knew or had reason to know of any defect in the design, installation, or maintenance of the guardrail that failed or that it had special expertise in fall protection for framing work done at dangerous heights.[10]

Plaintiff remonstrates that Polygon provided safety oversight over the entire construction site on a daily basis, that the contract between Polygon and Wood Mechanix contained specific framing requirements, that Polygon had the right to approve Wood Mechanix's fall protection plan, and that Polygon required Wood Mechanix's employees to attend weekly safety meetings.

That evidence notwithstanding, there is no evidence from which a jury could find that Polygon required Wood Mechanix to use guardrails as opposed to any other method of fall protection, or that the Polygon plan was produced independently of Wood Mechanix's decision to use guardrails. To the contrary, there is uncontroverted evidence that Polygon bargained for and relied on the expertise of Wood Mechanix in providing safety measures for the framing work and that Wood Mechanix alone decided to use guardrails as its form of fall protection on the project. The subcontract expressly required Wood Mechanix to prepare a safety plan for its work, which specifically included a fall protection plan for Wood Mechanix workers. In addition, the "Subcontractor Precon Safety Orientation" checklist required Wood Mechanix (not Polygon) to "[i]dentify all fall hazards" and "[d]escribe the method of fall arrest or fall restraint to be used for these hazards." Moreover, Trytko verified that Wood Mechanix's employees were trained and instructed in fall protection protocols and that Wood Mechanix would have a "competent and qualified person" inspect the fall-protection equipment daily.

---

[10] As noted, Polygon's managers testified that (1) Wood Mechanix was "taking their own safety program and critiquing it to the building or a project specific. And that's why we hire them, for the experts"; and (2) with respect to how a guardrail should be built: "It wasn't my job to know. I was relying on the expertise of somebody who did know."

Consistently with that allocation of responsibility and expertise, the uncontroverted evidence also showed that Polygon employees did not go into the Wood Mechanix work space generally and did not go onto the upper floors of any building being framed by Wood Mechanix until the floor was complete. In sum, although the evidence supports an inference that Polygon had a general understanding that fall protection should be in place while framing work is performed at heights, it does not support an inference that Polygon had special expertise or knowledge regarding how to design, construct, and maintain guardrails for that purpose. Instead, both contractually and operationally, Polygon relied on the expertise and knowledge of Wood Mechanix and its employees for the performance of those responsibilities. Under those circumstances, Polygon did not have a common-law duty to Wood Mechanix's employees, including plaintiff, to discover, warn against, or avoid unknown dangerous conditions relating to fall protection for the framing work.[11]

We recognize that, unlike in *Boothby*, we have concluded in this case that plaintiff's evidence was sufficient to survive summary judgment with respect to the right of control specification of his ELL claim. In *Boothby*, this court concluded that the defendant's lack of control over its independent contractor negated any duty under the ELL and also precluded the plaintiff from holding the defendant liable for the contractor's negligence. 341 Or at 46. That does not, however, alter our conclusion with respect to plaintiff's negligence claim in this case. Because the ELL was intended

---

[11] The decisions that the concurrence cites emphasize the significance of the hirers' control over the operative detail of the work in those cases. *Cf. Woodbury*, 335 Or at 163 (evidence permitted jury to find that defendant exercised actual control over safety aspects of project and, in particular, exercised actual control over that part of project that required plaintiff to work at dangerous height); *Kuhns v. Standard Oil Co.*, 257 Or 482, 488, 493, 478 P2d 396 (1970) (evidence showed that general contractor was obligated to "see that the job was done according to the plans and specifications," ensure that "job was done right," and "check[] after the equipment [was] installed to see that there [were] no leaks and that the equipment [was] operating properly," such that jury could find it liable for injuries resulting from oil leak "based on its own independent negligence in failing to test or inspect the oiling equipment to determine if it was functioning properly after the subcontractors had completed their work and the equipment was operational").

to impose higher standards of care upon employers than did the common law, circumstances giving rise to ELL liability may exist without liability in negligence also arising. *See Saylor*, 106 Or at 426-28; Or Laws 1911, ch 3, § 1.

This court addressed a similar issue in *Cortez*, where the court concluded that the defendant retained a sufficient right to control the manner or method of the risk-producing activity to create a triable issue with respect to the plaintiff's ELL claim, but nevertheless determined that the trial court properly had granted summary judgment to the defendant on a companion negligence claim. 356 Or at 277. In so concluding, the court recognized that

> "some tension may exist between our resolution of plaintiff's negligence and ELL claims. Any tension results, however, from the differences between the common-law tort standards * * * and the broader statutory standards that the legislature adopted in the ELL."

*Id. See also Howard v. Foster & Kleiser Co.*, 217 Or 516, 533, 332 P2d 621 (1958), *reh'g den*, 217 Or 516, 342 P2d 780 (1959) ("The [ELL] exacts of employers measures for the safety of employees which are more stringent than those of the common-law rule of due care.") (citations omitted).[12]

We conclude, based on the record before us, that the trial court properly granted Polygon's motion for summary judgment on plaintiff's negligence claim.

## IV. CONCLUSION

In summary, we conclude that plaintiff submitted sufficient evidence that Polygon retained a right to control the risk-producing activity at issue in this case to withstand

---

[12] In addition to expanding the categories of persons responsible for maintaining a safe work place beyond a worker's direct employer, as this court explained in interpreting an earlier version of what is now ORS 654.305:

"This statute * * * imposes a higher standard of care than that imposed under the rules of the common law. It requires that[,] in the operation of dangerous machinery[,] the employer shall use 'every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance(s) and devices.'"

*Fromme v. Lang & Co.*, 131 Or 501, 505, 281 P 120 (1929).

Polygon's motion for summary judgment with respect to that specification of plaintiff's ELL claim. Accordingly, we reverse the decisions of the trial court and the Court of Appeals on that specification and remand it to the trial court for further proceedings. We affirm the decisions of the trial court and the Court of Appeals with respect to the other specifications of plaintiff's ELL claim and his common-law negligence claim.

The decision of the Court of Appeals is affirmed in part and reversed in part. The decision of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.

**WALTERS, J.,** concurring.

I concur and write only to press an argument that plaintiff failed to make about the "special expertise or knowledge" principle. In my view, that principle is particular to claims against landowners and should not be extended to preclude a claim against a general contractor for its own common-law negligence.

This court previously has recognized that a general contractor can be held liable for its own negligence, even when the injured party is the employee of an independent contractor. In *Kuhns v. Standard Oil Co.*, 257 Or 482, 485-86, 478 P2d 396 (1971), the plaintiff, an employee of an independent contractor, sued both the general contractor and a different independent contractor for negligently causing his injury. This court upheld the jury's verdict against the general contractor, concluding that there was evidence from which the jury could have found that the general contractor was negligent in failing to test, inspect, or repair the facility. *Id*. at 494. The court explained that, "apart from the question of vicarious responsibility on the part of an employer of an independent contractor, the employer may be liable for any negligence of his own in connection with the work to be performed." *Id*. at 490. *Accord Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 163, 61 P3d 918 (2003) (concluding that defendant general contractor could be liable to employee of independent subcontractor where there was evidence permitting jury to find defendant exercised control over safety aspects

of project and failed to provide plaintiff with fall protection training or supervision).

This court also has recognized that, when a plaintiff seeks to hold a general contractor vicariously liable for the negligence of an independent subcontractor, the "special expertise or knowledge" principle does not apply. In *Macomber v. Cox*, 249 Or 61, 65, 435 P2d 462 (1968), the court acknowledged the general principle that "the employer of an independent contractor is not subject to liability for bodily harm caused to another by a tortious act or omission of the contractor or his servants." (Internal quotation marks omitted.) However, the court also cited the *Restatement (Second) of Torts* section 409 (1965), for the proposition that there are a variety of exceptions to that rule of immunity. *Macomber*, 249 Or at 65 n 3. The *Restatement* provides that that general principle does not apply when the general contractor fails to exercise reasonable care in the following circumstances: (1) in giving orders or directions; (2) in employing competent independent contractors; (3) in inspecting the work while it is in progress or after it is done; (4) in taking precautions necessary to enable the work to be done safely; (5) in performing the work that he retains to himself; and (6) in supervising the equipment and methods of the independent contractor. *Restatement (Second) of Torts* §§ 410-415. Thus, under both *Kuhns* and *Macomber*, a general contractor can be held liable for its own negligence when its negligence causes bodily harm to an employee of an independent contractor.

Historically, the "special expertise or knowledge" principle has been applied only to shield possessors of property from liability for the negligence of independent contractors hired to perform work in their areas of expertise. In *Yowell v. General Tire & Rubber*, 260 Or 319, 490 P2d 145 (1971), the case on which defendant in this case relies, the defendant was a landowner who was not engaged in the business that he had hired an independent contractor to perform. Similarly, in the two cases cited by the court in *Yowell—Feldewerth v. Great Eastern Oil Co.*, 149 SW2d 410, 413 (Mo Ct App 1941), and *Palenscar v. Michael J. Bobb, Inc.*, 439 Pa 101, 105, 266 A2d 478 (1970)—the courts treated

the defendants as possessors of land and the plaintiffs as invitees on the land on which they were injured. In both of those cases, the courts discussed the principle outlined in section 343 of the *Restatement (Second) of Torts* defining the liability of a possessor of land to an invitee. *Feldewerth*, 149 SW2d at 413; *Palenscar*, 439 Pa at 105. In contrast, general contractors are in the construction business and must perform their work safely. They should not be able to escape liability because their subcontractors are required to do likewise.

I disagree with this court's statement in *Yowell*, in *dicta*, that, "[r]egardless of whether defendant is to be viewed in its relation to plaintiff primarily as a possessor of land or as one who contracts for services," the result should be the same. 260 Or at 324. If a general contractor is itself negligent, the "special expertise or knowledge" principle should not apply to absolve that contractor of liability.